UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

DRAFT

IN RE:                        )
                              )      Case No. 01-MDL-00875
ASBESTOS PRODUCTS             )
LIABILITY LITIGATION          )      Philadelphia, PA
                              )      July 13, 2012
                              )      9:40 a.m.
---------------------------

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:        ROBERT G. McCOY, ESQUIRE
                           DANIEL HARRIS, ESQUIRE
                           MICHAEL P. CASCINO, ESQUIRE
                           CASCINO VAUGHAN LAW OFFICES, LTD.
                           220 South Ashland Avenue
                           Chicago, Illinois  60607

For the Defendants,        JOHN A. FONSTAD, ESQUIRE
G.E.:                      SIDLEY AUSTIN, LLP
                           1051 K Street, N.W.
                           Washington, D.C.  20005

For the Defendants,        ROBERT N. SPINELLI, ESQUIRE
Hedmine Mines, LTD.,       KELLEY, JASONS, McGOWAN,
etc.:                      SPINELLI & HANNA, LLP
                           Two Liberty Place
                           Suite 1900
                           50 South 16th Street
                           Philadelphia, Pennsylvania  19102

For the Defendants,        DAVID M. SETTER, ESQUIRE
Asten, Industrial          FORMAN, PERRY, WATKINS,
Holdings, Unifax,          KRUTZ & TARDY, LLP
Owens-Illinois,            Denver Financial Center
Uniroyal, etc.:            Tower 1
                           1775 Sherman Street
                           Suite 1900
                           Denver, Colorado  80203

EXHIBIT 35

(Appearances continued)

|  |  |
|---|---|
|  | JENNIFER M. STUDEBAKER, ESQUIRE |
|  | DANIEL J. MULHOLLAND, ESQUIRE |
|  | FORMAN, PERRY, WATKINS, |
|  | KRUTZ & TARDY, LLP |
|  | Cities Centre |
|  | Suite 100 |
|  | 200 South Lamar Street |
|  | Jackson, Mississippi  39201 |
| For the Defendants, | RICHARD M. LAUTH, ESQUIRE |
| Westinghouse, Hirco, | EVERT, WEATHERSBY, HOUFF |
| Hobart Brothers, | 3405 Piedmont Road |
| Linde, etc.: | Suite 200 |
|  | Atlanta, Georgia  30305 |
| For the Defendants, | KAITLYN N. CHENEVERT, ESQUIRE |
| Georgia-Pacific: | HEPLER BROOM, LLC |
|  | 150 North Wacker Drive |
|  | Suite 3100 |
|  | Chicago, Illinois  60606 |
|  | GEORGE A. KISER, ESQUIRE |
|  | HEPLER BROOM, LLC |
|  | 130 North Main Street |
|  | Edwardsville, Illinois  62025 |
| For the Defendants, | EDWARD CASMERE, ESQUIRE |
| Owens-Illinois, | SCHIFF HARDIN, LLP |
| Uniroyal, etc.: | BRIAN WATSON, ESQUIRE |
|  | 233 South Wacker Drive |
|  | Suite 6600 |
|  | Chicago, Illinois  60606 |
| For the Defendants, | CAROL PERKINS, ESQUIRE |
| Union Carbide Corp. | TOBIN TAYLOR, ESQUIRE |
| and CertainTeed Corp.: | HEYL ROYSTER |
|  | Suite 600 |
|  | Chase Building |
|  | 124 S.W. Adams Street |
|  | Peoria, Illinois  61602 |
| For the Defendants, | TERRENCE McGEEVER, ESQUIRE |
| CertainTeed Corp.: | McGEEVER LAW FIRM |
|  | 355 Lancaster Avenue |
|  | Suite 205 |
|  | Haverford, Pennsylvania  19041 |

(Appearances continued)

|  |  |
|---|---|
| For the Defendants, | RONALD AUSTIN, JR., ESQUIRE |
| Miller Electric Mfg.: | BROTHERS & THOMPSON, P.C. |
|  | 100 W. Monroe Street |
|  | Suite 1700 |
|  | Chicago, Illinois  60603 |
| For the Defendants, | JACK LAFFEY, ESQUIRE |
| Dal-Tile | WHYTE, HIRSCHBOECK, DUDEK, S.C. |
| Motion Industries, | 555 East Wells Street |
| Inc., Playboy | Suite 1900 |
| Enterprises, Inc.: | Milwaukee, Wisconsin  53202 |
| For the Defendants, | EMILY C. ZAPOTOCNY, ESQUIRE |
| Foster-Wheeler, | SEGAL, McCAMBRIDGE, SINGER & MACHONEY |
| Weil-McLain, etc.: | 233 South Wacker Drive |
|  | Suite 5500 |
|  | Chicago, Illinois  60606 |
| For the Defendants, | DAVID F. FANNING, ESQUIRE |
| Exxon Mobil: | KEVIN G. OWENS, ESQUIRE |
|  | JOHNSON & BELL, LTD. |
|  | 33 West Monroe Street |
|  | Suite 2700 |
|  | Chicago, Illinois  60603 |
| For the Defendants, | AGATHA K. RAYNOR, ESQUIRE |
| Brigman Fence/Okonite: | CRIVELLO, CARLSON S.C. |
|  | 710 North Plankinton Avenue |
|  | Suite 500 |
|  | Milwaukee, Wisconsin  53202 |
| For the Defendants, | JASON L. SCHMOLZE, ESQUIRE |
| Okonite Inc.: | McCULLOUGH, GINSBERG, MONTANO |
|  | & PARTNERS, LLP |
|  | 320 East 53rd Street |
|  | Suite 100 |
|  | New York, New York  10022 |
| For the Defendants, | WILLIAM L. SHENKENBERG, ESQUIRE |
| Riley Power, Inc.: | MALLERY & ZIMMERMAN, S.C. |
|  | 731 North Jackson Street |
|  | Suite 900 |
|  | Milwaukee, Wisconsin  53202 |
| For the Defendants, | JESSICA REENOCK, ESQUIRE |
| Culter Hammer: | GOLDBERG, MILLER & RUBIN |
|  | North American Building |
|  | 121 South Broad Street |
|  | Suite 1500 |
|  | Philadelphia, Pennsylvania   19107 |

(Appearances continued)

|  |  |
|---|---|
| For the Defendants, | TIMOTHY J. CAMPBELL, ESQUIRE |
| Asten, Inc: | CHRISTIE, PABARUE, MORTENSON |
|  | & YOUNG |
|  | 1880 JFK Boulevard |
|  | Philadelphia, Pennsylvania  19103 |
| For the Defendants, | JENNIFER E. WATSON, ESQUIRE |
| Ohio Edison: | WILBRAHAM, LAWLER & BUBA |
|  | 603 Stanwix Street |
|  | Two Gateway Center #17 North |
|  | Pittsburgh, Pennsylvania  15222 |
| For the Defendants, | KATHRYN R. DOWNEY, ESQUIRE |
| Bechtel Corporation: | THOMAS GILLIGAN, ESQUIRE |
|  | MURNANE BRANDT, P.A. |
|  | 30 East Seventh Street |
|  | Suite 3200 |
|  | St. Paul, Minnesota  55101 |
| For the Defendants: | MEGAN MURRAY, ESQUIRE |
| International Minerals | WEBER, GALLAGHER, SIMPSON |
| & Chemicals: | STAPLETON, FIRES & NEWBY |
|  | 2000 Market Street |
|  | Suite 1300 |
|  | Philadelphia, Pennsylvania  19103 |
| For the Defendants, | STEPHEN JENKINS, ESQUIRE |
| AW Chesterton: | COOLEY, MANLON, JONES LLP |
|  | 21 Custom House Street |
|  | Boston, Massachusetts  02110 |
| For the Defendants, | WILLIAM R. MUSGROVE, ESQUIRE |
| Erickson: | HAWKINS, PARNELL, THACKSTON |
|  | & YOUNG, LLP |
|  | 4000 SunTrust Plaza |
|  | 303 Peachtree Street, NE |
|  | Atlanta, Georgia  30308 |
| For the Defendants, | DAVID L. KELLEHER, ESQUIRE |
| Metso Paper USA: | JACKSON & CAMPBELL, P.C. |
|  | 1120 20th Street NW |
|  | South Tower Suite 300 |
|  | Washington, DC  20036 |
| For the Defendants, | MARK DesROCHERS, ESQUIRE |
| U.S. Steel: | DesROCHERS LAW OFFICE |
|  | 2800 E. Enterprise Avenue |
|  | Appleton, Wisconsin  54913 |

(Appearances continued)

|  |  |
|---|---|
| For the Defendants, | KNIGHT S. ANDERSON, ESQUIRE |
| Western Electric Co.: | HILL, FUTWIDER, McDOWELL, FUNK |
|  | & MATTHEWS |
|  | One Indiana Square |
|  | Suite 2400 |
|  | Indianapolis, Indiana  46204 |
| For the Defendants, | JOSEPH SULLIVAN, ESQUIRE |
| Rockbestos: | SANCHEZ, DANIELS & HOFFMAN, LLP |
|  | 333 W. Wacker Drive |
|  | Suite 500 |
|  | Chicago, Illinois  60606 |
| For the Defendants: | DREW ODUM, ESQUIRE |
|  | Tucker Ellis |
|  | 925 Euclid Avenue |
|  | Suite 1150 |
|  | Cleveland, Ohio  44115 |
| For the Defendants: | JOHN GAUL, ESQUIRE |
|  | MARON, MARVEL, BRADLEY & |
|  | ANDERSON, P.A. |
|  | Three Logan Square |
|  | 1717 Arch Street |
|  | Suite 2910 |
|  | Philadelphia, Pennsylvania  19103 |
|  | Suite 700 |
|  | Milwaukee, Wisconsin  53202 |
| Audio Operator: | NELSON MALAVE |
| Transcribed by: | DIANA DOMAN TRANSCRIBING |
|  | P.O. Box 129 |
|  | Gibbsboro, New Jersey  08026-0129 |
|  | Phone: (856) 435-7172 |
|  | Fax:   (856) 435-7124 |
|  | Email:  dianadoman@comcast.net |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

6

I N D E X

TOPICS

B-1 Issues                                    17
B-2 Issues                                    29
Consolidation of Expert Reports               34
Redundant and Premature Discovery             41
Discovery Supplementation Questions           44
Scheduling Order Issues                       72

7

(The following was heard in open court at 9:40 a.m.)

THE COURT:  As you folks know, we have a heat problem here.  So I've addressed it.  And I encourage you to do the same.  As my clerk said, we have an awful lot of suits here today, and more than I anticipated.  It sounds like folks didn't respond to the request to send an email in telling us if you were going to appear.  But nonetheless, here we are.

UNIDENTIFIED COUNSEL:  Some did.

THE COURT:  I welcome you all to -- right, some did.  I welcome you all to Philadelphia.  Please be seated.  I have some interns coming in.  You guys don't mind sitting down, just move the one over.  There's four of them.  They can sit there, that would be great.

All right.  So Mr. Spinelli?

MR. SPINELLI:  Judge, how are you.

MS. STUDEBAKER:  Studebaker.

THE COURT:  Have I met you before?

MS. STUDEBAKER:  Yes, sir.

THE COURT:  I'm sorry.

MS. CHENEVERT:  Ms. Chenevert.

THE COURT:  I'm sure that I've met you before, have I?

MS. CHENEVERT:  No.

THE COURT:  Okay.  Mr. Setter, Mr. Lauth.

MR. FONSTAD:  John Fonstad.

Colloquy

8

THE COURT:  You're John Fonstad.  I'm sorry I'm going to have trouble here.  Mr. Cascino I certainly remember.  Mr. Mulholland I remember.

MR. MULHOLLAND:  Good morning, Judge.

THE COURT:  Mr. Mulholland I need to tell you that when you came up on the elevator today, you brought a rise in the heart of one of my interns, who is a resident of Little Rock, Arkansas.  And he was so pleased to hear a southern accent that he came in with a smile on his face.

MR. MULHOLLAND:  There you go.

MR. MCCOY:  Judge, I wanted to ask one thing here.  We have Dan Harris here who is an advisor to our firm.  And he hasn't actually appeared in the case because he's really just an advisor to our firm.  I was wondering, he's not speaking but I wonder if he could sit by me --

THE COURT:  I don't have a problem with that.

MR. MCCOY:  Okay.  Thank you.

THE COURT:  And I think that the general proposition is to the extent that there's going to be input and appearance, you know as you know we need an entered appearance and we need the pro hac vice issues to be dealt with.  But otherwise I'm happy to have him.  Good morning, sir.

Okay.  I'm going to tell you what we have done.  And to try to give this -- let me just sort of lay out what I'm hoping that we can accomplish today.

Colloquy

9

And I was asked yesterday by Mr. Lauth, I think, somebody, about how long we expected to be here, and that's going to depend largely based upon you and how efficient you make use of this time.

But my hope and expectation is, given that it's a Friday afternoon in the summer, that I can get you out of here, you know, 3:00-ish, or something like that.  I suspect maybe you made arrangements for 5:00, 6:00 flights, most of you, back to the Midwest or wherever you're going.

That's kind of what I'm hoping to be able to accomplish.  We, in the order of things, as we went through it -- I like to work off of these big sheets, it helps me organize stuff.

And I did that.  And I, at the risk of -- at the risk of putting something on there that one might deem to be sort of preliminary judicial inclinations about things, which I don't think I did much of, but I tried to state what I understood the issues, and to delineate a little bit, just to help me in terms of the structure of our thinking and the structure of the issues, the impact and implications of the previous rulings.  You know, the need obviously for some consistency with respect to the previous rulings that we've had, or the application of the previous rulings to the current problems.

And, you know, trying to recognize a little bit

1  about the history of from whence we have come.  I did -- I did
2  think, however, that the way to approach this was, for me,
3  was, we've been doing a number of things now with respect to
4  some evidentiary rulings on some issues that obviously have
5  application to those particular cases, but in my view, the
6  clear message -- the clear intended message, in my view, is
7  that it ought to have application beyond those specific cases
8  and principles that are set out by virtue of some of those
9  rulings would need to apply.
10       And I think you would expect and should expect that,
11  you know, right or wrong, they will apply as cases go forward.
12  The -- there have been some reaction to some things I know
13  from the plaintiff's perspective that we have a very
14  aggressive schedule.  I appreciate that.  From the defendants'
15  perspective, it's not an overly aggressive schedule, given the
16  overall history with respect to those cases.  Including going
17  back to the time when Judge Reed was involved, and there was
18  meant to have been a lot of work done on these underlying
19  cases, anticipating that they were going to be resolved in the
20  MDL all during those mediation process.
21       And, you know, at the risk of, you know, revisiting
22  the history of all of that, that clearly has implications, in
23  my judgment, with respect to the overall time related to, for
24  folks to do things in terms of gaining knowledge of and
25  gaining an understanding of the various issues that affect the

1  positions of their clients in particular cases.
2       So, as we are coming, frankly, to crunch time, as
3  discovery deadlines have passed on the top 10, and 1 and 2 --
4  2 and 3, 1 and 2 groups.  The third one passed -- just passed.
5  You know, and that's, as you know from previous motions that
6  have been filed with respect to extensions of discovery, we
7  are very unreceptive to further extensions of discovery
8  deadlines.
9       But I did indicate, and I'm sure you detected when
10  the question arose with respect to having another session and
11  trying to look at some of these issues in a more global way,
12  looking at it, in my judgment, from the perspective of going
13  forward, not trying to recreate things that happened in the
14  past, what's done is done, for better or for worse, but from
15  the perspective of going forward, I am -- I was interested in
16  the discussion with respect to trying to streamline things.
17       The notions that Mr. McCoy had mentioned and the
18  CVLO folks had mentioned about coordinating discovery
19  predicated upon sites, and according -- and dealing with the
20  particular problems of the infirm -- more infirm witnesses, in
21  extremis is a phrase that was used early on in connection with
22  some of them.  And as I've expressed numerous times, I'm
23  sympathetic to all that.
24       And I think that there has been -- this is -- it's
25  not as if these issues came up for the first time, by any

1  means.  In fact, it's my recollection, of course you guys get
2  -- order all these records, so hopefully my recollection is
3  consistent with what I said, or what we articulated back at
4  the time, that from my first involvement in the case, and Joel
5  has more history back with Judge Reed, as you know, is that
6  there was lots of discussion with you all with respect to the
7  way in which we were going to organize these cases.
8       And I recall the site discovery issue was something
9  that was discussed, and was on the table.  And I clearly
10  remember when I first got involved in the cases, looking at
11  the question with respect to the most severely impaired first,
12  and looking at the questions with respect to the living,
13  severely impaired first.  That was the genesis of what was the
14  magic 50, that became 20, that became 10, that became 9, it
15  became 8, and whatever it was.
16       That was why and how all that was done.  To front
17  load on those cases.  You all would get some determinations
18  with respect to rulings as those cases moved forward, and with
19  the understanding of the implications of those rulings would
20  have, that those rulings would have implications beyond the
21  specifics of those particular cases.
22       So that's what I see with respect to the, you know,
23  from where we came and how we got to where we are now.  I've
24  been disappointed, frankly, that there hasn't been more
25  activity with respect to settlement.  I understand some of the

1  positions of the parties with respect to settlement.  And it
2  was my hope and my expectation, and I'm naive enough to still
3  maintain that hope, maybe still have some expectation, that as
4  more rulings come through on 8012's and on summary judgment
5  issues and on discovery issues, there will be some adjustments
6  in the positions that parties are taking with respect to
7  settlement.
8       I understand that defendants want to have the --
9  some of the causation issues determined by virtue of rulings.
10  That's been done, of course, as you know, on some, anyway.
11  And you've probably seen, I'm sure you're paying very close
12  attention to Judge Robreno's rulings, not just on CVLO, but on
13  other cases throughout the country.
14       And I think you've probably got a pretty good sense,
15  because he's issued a lot of rulings on a lot of cases that go
16  to summary judgment questions.
17       There's some of these cases where summary judgment
18  motions have been denied, there have been remand orders.
19  There was a suggestion at some point that was wrong, because
20  they were supposed to go back to me for purposes of "some
21  certification" with respect to no possibility of discovery
22  before it goes back.
23       That was under the Judge Reed regime.  That's not
24  part of our regime.  What we're looking for is, if the parties
25  want to have further settlement conferences, I would not in

Colloquy 14

1  any way try to discourage it.  But if there have been motions
2  for summary judgment denied, I would have thought -- we didn't
3  get requests from what I recall on those few cases, part of
4  CVLO, where motions for summary judgment were denied, to
5  participate in settlement conferences, and we would make
6  ourselves available, myself and some of the other Magistrate
7  Judges who are not quite as busy in all this now, to work with
8  you all with respect to settlement conferences on those cases
9  where motion for summary judgment have been denied.
10      I hope that's something that could still be done.
11 Because we still see that our mantra is to exhaust all those
12 possibilities before they get back to the transfer of courts.
13      Not to say it couldn't continue on in the transfer
14 of courts.  That's going to be up to those particular judges.
15 But we want to take advantage of whatever expertise, which you
16 may or may not accept, on your position on particular issues
17 that we have tried to gain as a result of working with these
18 things, so that we can be useful in terms of helping to
19 facilitate settlement.
20      So we'll see, and that's still -- that's still out
21 there for everyone to try to jump onto.  Okay.  So that's the
22 where all this is, and how I now see things.  I thought that,
23 looking at the agenda, which principally Joel was responsible
24 for.  We spent time together on it with Lauren, obviously, to
25 try to work it up, based upon the consideration of the -- what

Colloquy 15

1  you folks had suggested to us.  I thought that the 1-B issues,
2  the consolidation questions were what I thought were really
3  more the heart of why it was that we wanted to have this
4  conference in the beginning.
5      I didn't feel that I needed necessarily to have oral
6  argument on any of the outstanding motions.  And was, you
7  know, we're developing positions on them, we're close to
8  entering orders on some more of these.
9      The orders might not be coming out as quickly as you
10 would all like, but there are orders that are coming out and I
11 know that we have some remaining.  Certainly -- I'm not sure
12 of the count, maybe half a dozen or so that are now fully
13 briefed.  And we're doing our best to try to get these out as
14 efficiently as we can.
15      I also understand that the issuance of orders on
16 discovery motions, and making legal determinations, may have
17 an impact with respect to the scheduling on cases, to the
18 extent that the orders would suggest that some further
19 discovery of some sort can go forward.
20      There's been some suggestion, I think one of Mr.
21 McCoy's proposals, as I understand it, is that we do something
22 with respect to further time for discovery once a discovery
23 order has been issued.
24      And I can see that that might apply in some
25 situations.  It might be appropriate in some situations.  But

Colloquy 16

1  we -- I personally reject it as a universal concept that needs
2  to be applied in all cases.
3      It depends to me upon what it is that is the basis
4  for the order, and what it is that -- what we believe the
5  impact of the order would have upon -- upon the overall
6  progression of the case.
7      I mean, as an example, and I know one of the issues
8  that we ruled upon that my guess is we probably satisfied in
9  making both sides unhappy, which means it's a good thing for a
10 Judge to do, with respect to the transcripts, electronic
11 transcripts that we order that needed to be produced in a
12 sequencing kind of way.
13      When those transcripts get prepared, my instinct is,
14 as I hear about this, and there will be -- you guys are still
15 briefing some aspects of this, is that that probably would not
16 generate a need for any further discovery.  Because the
17 question would be, if they are electronic transcripts and
18 those transcripts are of such a nature that they could be
19 utilized in a further proceeding, then they will be there to
20 be utilized in a further proceeding.
21      If they can be sufficiently linked up to show that
22 the evidence from that transcript would relate to a present
23 case, then it would seem to me, and I think it's probably a
24 trial judge decision, but it would seem to me that the
25 evidence from that deposition, assuming the party who was

Colloquy 17

1  implicated, the product manufacturers implicating would have
2  the opportunity to -- had the opportunity to participate in
3  that deposition, that they could be utilized.
4      That -- you might have certain different views about
5  that, but that's my broad instinct, by way of example, with
6  respect to how that would go.  If there's something that calls
7  for production of documents and we are ordering further
8  production of documents, that might indicate some further
9  information has arisen from the documents at that production,
10 I think it could very well be a different story.
11      Just by way of example as to what my thinking is
12 about some of these issues.
13      Okay.  So I think what I would like to do would be
14 to start out with you on the B-1 issues.  And let's get right
15 into this with respect to the -- the way we lined it up was,
16 and exactly the way it's postured is less important to me than
17 having a discussion about the issue.
18      And I did get some further submission from Mr.
19 McCoy's team late yesterday.  I mean, to be frank, I skimmed
20 it in my Chambers at 4:00 yesterday, I think, something like
21 that.  And I want to just hear from Mr. McCoy a little bit
22 with respect to what the proposal is with respect to that.
23      And my sense is, and I will tell you this, that when
24 the question came up with respect to having the conference, I
25 was -- I mean, I wasn't sure how the defendants were going to

Colloquy 18

1 respond, and I was -- to be frank about it, pleasantly
2 surprised that the defendants responded and said, sure, they
3 thought a conference was a good idea.
4 And so that, frankly, gave me some suggestion that
5 the defendants were willing to talk to the plaintiffs about
6 making some adjustments, given some of the issues that had
7 been raised, in a meaningful way.
8 And as you know, we've always been trying to
9 encourage you all to talk and try to find ways in which you
10 could help us to solve problems, so that we don't make --have
11 to make hard up and down rulings.
12 After all, you guys know a whole lot more about
13 these cases than we do, and when you can resolve things
14 amongst yourselves, it's very, very helpful, to me, anyway.
15 So -- and I thought this might have been one where
16 there was the possibility of some discussion between the
17 plaintiffs and the defendant. I don't know if you had any
18 more discussion about it or not. But let me just, first of
19 all, hear from you briefly, Mr. McCoy, with respect to the
20 adjustments that you would like to have made, and the
21 circumstances that would relate to this.
22 If you want me to try to tee up what I understand
23 about it, I will, case. Let me do this --
24 MR. MCCOY: I just want to make sure I got the right
25 one in front of me, Judge. This is the discovery

Colloquy 19

1 consolidation item under Roman Numeral 1-B, and number 1 that
2 the --
3 THE COURT: Yes. Here's what -- here's the way I
4 understand this. You have, obviously, a number of elderly
5 witnesses. I presume all or most of those witnesses are --
6 are probably also plaintiffs.
7 Maybe they're already been deposed in their own
8 cases. I don't know. And maybe they have information with
9 respect to conditions at particular work sites that could
10 impact upon other cases.
11 My judgment is, that it is reasonable for you to be
12 able to identify those situations where you think a particular
13 elderly witness, and, frankly, I'm not sure it should be
14 limited to elderly witnesses. Any particular witness, has
15 information that would relate to 2 cases, 10 cases, 20 cases,
16 and you have good faith basis to believe that that particular
17 witness was in a particular situation with respect to a
18 particular plaintiff, another plaintiff who's got another case
19 that you can identify, that you can, you know, in effect
20 certify, or make a representation as counsel, good faith
21 representation as counsel, that you believe this witness has
22 information that's going to affect case number 1, case number
23 12, case number 15, case number 35.
24 And I see no difficulty with you noticing a -- the
25 deposition for multiple cases, after you have made and

Colloquy 20

1 undertaken that assessment. And even -- but what I would --
2 what I would -- to the extent that I would permit this to
3 happen, it would be a deviation from protocol that you would
4 be -- have the responsibility to do that, and only provide
5 notice to those parties whose products are going to be
6 implicated.
7 Now you have a good faith basis to do that. Now
8 that doesn't necessarily mean that this guy's going to say for
9 sure that I saw this guy, you know, tracking asbestos off of
10 the surrounds of a GE turbine. But if there's a basis to
11 believe that this witness has reasonable knowledge that there
12 was this kind of activity going on in this particular area
13 that's going to have an impact upon this particular plaintiff
14 in this particular time period, I would say you should be able
15 to do it.
16 And I would be -- I would want to hear from
17 defendants as to why he should not be able to do it, under the
18 assumption that you have otherwise complied with the principal
19 objectives of the protocol, as would relate to that particular
20 witness. And many of the protocol issues that we have raised
21 are -- and the information that's supposed to be provided,
22 relate more to the particulars of individual plaintiffs, to
23 the extent it talks about, you know, medical records, and to
24 the extent it might talk about, as opposed to, I don't know,
25 Social Security records that would show the earning statements

Colloquy 21

1 that would indicate where somebody would have worked, things
2 like that.
3 I suppose that might be something that would relate
4 to particular co-workers who would have -- who would be site
5 witnesses.
6 But I don't think it's enough to say this guy worked
7 at the Quad Cities facility. If I hear, and I suspect the
8 defendants are probably ready to tell me, that facility was 20
9 square miles, or who knows what, and there were 12,000
10 different structures, and there were 8,500 turbines, and you
11 got to be more specific and particular about that.
12 That's the way I would look at that. But I'm not
13 going to be responsive to hearing the defendants say, no, it's
14 got to be one at a time. As long as you have some reasonable
15 attachment.
16 I'm liking that Mr. Harris is waving his head up and
17 down. He thinks these are all pretty good ideas. I'm happy
18 to have him sit at the table, if he's going to keep doing
19 that.
20 So what do you say, Mr. McCoy?
21 MR. MCCOY: Judge, everything you said is right.
22 The only thing I would add is that -- is to make the
23 disclosure of the job site the guy is going to testify about,
24 and the products that he's going to implicate, or the --
25 whatever it is -- who's got the product --

Colloquy                                                                22

1    THE COURT:  Right.

2    MR. MCCOY:  -- with asbestos on it.

3    THE COURT:  Right.

4    MR. MCCOY:  Which we can do.  And we'll -- we'll say

5  it's as to these particular defendants that were affected.

6  And there may be some defendants who aren't the product

7  defendant, but the equipment defendant themselves, but who

8  have responsibility for the job site.

9    THE COURT:  Yeah.  Yeah, yeah, yeah.  Some -- the

10 reasonable theory of liability.  I understand that.

11   MR. MCCOY:  And I would ask you if it -- probably

12 one of the caveat, which is if the guy is testifying about

13 knowing a particular individual at that job site, and what

14 that particular individual did.  Because, typically, we talked

15 about how these people get approved, 50 or 100, or sometimes

16 more pipefitters, the guy may know what one or two of the

17 people actually did, but the rest of them would just be

18 knowing that that activity, creating that exposure with that

19 brand or product took place.

20   So I would say you should identify the people that

21 he -- in addition to what Your Honor said, the people that he

22 actually knows about by person, by face.

23   THE COURT:  Yes.  Terrific.  You know -- you know

24 enough now, I think, to know what Judge Robreno thinks about

25 the causation evidence, and what's going to be necessary in

---

Colloquy                                                                23

1  order to survive summary judgment.

2    And that's the kind of thing that I'm talking about.

3  Now is there any reason -- let me ask the nay-sayers here at

4  the end of the table, Mr. Mulholland and Mr. Setter.  Is there

5  any reason why this doesn't make sense?

6    MS. STUDEBAKER:  Yeah, as I said, they're going to

7  pass to me, I think.  No, that's exactly, we were kind of

8  talking among ourselves -- Jennifer Studebaker for the record

9  -- but that that's exactly what we were asking for.

10   That's what we wanted the plaintiffs to provide us,

11 not simply a list that has a name, address and whether the

12 person is represented by Cascino Vaughan.

13   THE COURT:  I thought we thought this all up

14 ourselves.  You mean you're not going to let him think you put

15 that in my lap just to stop --

16   MS. STUDEBAKER:  No, sir.  Absolutely not.  But

17 that's what we mean, and we think it's a great idea.

18   THE COURT:  Mr. Spinelli?

19   MR. SPINELLI:  No, the only thing I was going to

20 say, Judge, is that there has to be some real particularity of

21 the link between the product exposure and --

22   MS. STUDEBAKER:  Yes.

23   MR. SPINELLI:  -- the plaintiff.  And it seems as if

24 Mr. McCoy is agreeing to that, at this particular time.  I

25 didn't think there was an agreement to that before, but it

---

Colloquy                                                                24

1  just can't be generic job site testimony, and saying it

2  applies to all these guys.  There has to be a link.  In

3  certain litigation they call them placement witnesses.  They

4  have to put that product with that particular plaintiff.

5    If that is what the Court is talking about, and I

6  believe it is, and if that -- Mr. McCoy is agreeing to it,

7  which I believe he is.  I think that's the --

8    THE COURT:  I'm not sure I know it by all these

9  particular labels that you --

10   MR. SPINELLI:  Right.

11   THE COURT:  -- but, yeah, it sounds like the same

12 concept.

13   MR. SPINELLI:  Right.

14   MS. STUDEBAKER:  Yeah.

15   THE COURT:  Well okay.  So I would -- I would

16 suggest that what needs to happen is, you know, once again, as

17 we do, and we often do quite successfully when Ms. Studebaker

18 and Mr. McCoy or Mr. Cascino are involved, is to -- or we'll

19 bring Mary Margaret Gay involved, bring these ladies together

20 with Mr. McCoy or Mr. Cascino, whoever, but have someone

21 dedicated to this and get it done within the next couple of

22 days.

23   That is in terms of writing up another protocol, if

24 it's an adjustment, if it's an amendment, you know, whatever,

25 something like that.  Mr. Lauth, you look agitated.

---

Colloquy                                                                25

1    MR. LAUTH:  How does this differ from what the

2  protocol currently requires?  That's what I'm not clear on.

3  All we've asked for, in terms of the naysaying, is that those

4  plaintiffs that they're proposing to offer testimony for, or

5  on behalf of, however many people are cross-referenced into

6  this site worker's testimony, we just want, and to channel Mr.

7  Drumke for a minute here, answers to the interrogatories that

8  tell the who, what, where and when about the plaintiffs that

9  this guy's going to offer testimony for.

10   We can't do an effective cross-examination on their

11 elderly witness, when we don't know anything about the

12 plaintiffs that he's purporting to testify about.  If they

13 say, I was at work site X from 1945 to 1955, and all of

14 the subsequent plaintiffs have no, you know, we soon later

15 find out have no connection or overlap on the years, then

16 we've wasted our time.

17   We've wasted everybody's time under a compressed set

18 of deadlines, sitting in a deposition where a guy gives

19 generic site worker ID that won't help any -- it won't help

20 plaintiff overcome the burdens that they have to put on -- or

21 that they have to respond to in our motions for summary

22 judgment.

23   THE COURT:  Well I'm not going to let -- I'm not

24 going to let you snatch away from the prospect of having an

25 arrangement by those comments.  Because I think it's sensible,

**Colloquy** 26

1   maybe it goes a little bit further than -- you know, I mean,
2   it's -- a lot of this is a matter of degree.  I'm not sure how
3   close the placement has to be, to use Mr. Spinelli's phrase.
4          But -- and that's what I would like Ms. Studebaker
5   and Mr. McCoy to sit down and try to work out.  You can jump
6   in an do it, you know, and sit down and work it out.
7          And I think generally along the lines of what you've
8   done with the protocol is right.  I thought the protocol was
9   meant to limit only one -- one, the deposition notice for one
10  case at a time.  Okay.
11         You've not been using that way, that's not --
12  okay.  I thought there was language in there like that.
13         MS. STUDEBAKER:  All right.
14         THE COURT:  All right.  Good.  Well that takes care
15  of that.  Mr. McCoy, are you satisfied with that?
16         MR. MCCOY:  Yes, Judge.
17         THE COURT:  Okay.
18         MR. MCCOY:  We'll work that out.
19         UNIDENTIFIED COUNSEL:  Your Honor, is there a
20  certification and --
21         MR. MCCOY:  We would invite Ms. Studebaker up to the
22  Lake Michigan cooler air, if it is that way anymore with the
23  climate changes.
24         THE COURT:  Maybe she'd be grateful to have that.
25  Yes, Mike?

**Colloquy** 27

1          MR. CASCINO:  As I -- I'm not sure if I'm hearing
2   this correct, but what I -- Mr. Spinelli made a comment about
3   the mere testimony.  If you have an individual who perhaps
4   testifies as to 2 or 3 particular plaintiffs, but his
5   testimony, if those defendants are there, may be applicable to
6   other cases which we could list for that particular job site,
7   but it would seem to me that as to the cases that that
8   plaintiff doesn't necessarily know the -- or the witness at
9   the deposition doesn't know that particular plaintiff, that
10  those are instances that maybe has to be worked out where
11  there is not a need for these new interrogatories to get
12  answered and everything like that.
13         THE COURT:  No.  No.  What I'm saying is -- I mean,
14  yes, you're right.  The witness might not know, but I cannot
15  accept the fact that the lawyers wouldn't know.  The lawyers,
16  you guys, need to know what potential cases this witness's
17  testimony is going to implicate.
18         And if you've not -- if you've not noticed the
19  deposition in connection with those potential cases, and not
20  just that, but the potential targets, the potential product
21  manufacturers who you reasonably believed would have been
22  responsible for some exposure at that location, that's the
23  obligation that I believe needs to be -- and, frankly, I, you
24  know, I've gone back to this a lot of times.
25         I guess I would have thought, or hoped and one of

**Colloquy** 28

1   the things that I saw that came in the other day as we were
2   looking through some things is it looks to me like there's
3   more organization to the way in which you guys have all these
4   things set out now, maybe that had been.  I don't know.  I
5   don't know, because I don't know what the genesis of it was,
6   but that's what I'm saying in terms of the requirement.
7          UNIDENTIFIED COUNSEL:  Tying that into the concept
8   of disclosing the very knowledge I think is key to a lot of
9   things on this agenda.  There's a place for the line recently
10  drawn by Your Honor to just tell us what it is.  That's how I
11  would see us working that out, and that we would be making
12  sure that there's sufficient attorney knowledge as to what
13  witness -- what cases it was pertinent to, what's described in
14  the notification about the deposition.
15         That's how I would envision it.
16         UNIDENTIFIED COUNSEL:  A lot of attorneys involved.
17         THE COURT:  Okay.  I, you know, I -- I mean, I'm
18  just, frankly, fundamentally not sure that I agree with you on
19  this attorney knowledge business, and we'll get to that.  But
20  I think the message that I've given is pretty clear.  I hope
21  it's pretty clear, and that's the way that I see it.
22         Now I would also say this, because I am concerned,
23  and I think that, you know, you might think it imposes burdens
24  upon you, but these are burdens that you've agreed to
25  undertake by representing these clients, as far as I'm

**Colloquy** 29

1   concerned.
2          That to the extent that it can be demonstrated that
3   there was -- when the witness occurs, and the witness comes in
4   and testifies and never says anything about, you know, a GE
5   product, or a Westinghouse product, or whatever it happened to
6   be, I'm not saying that that in and of itself would
7   necessarily bring about a proper motion for sanction with
8   respect to cost to have the lawyer for that be there.
9          But I would say, it might set up a suggestion that
10  such a sanction might be appropriate, and then would put me in
11  a position to go back to you and say, the witness didn't
12  identify the product, tell us your good faith reason why you
13  thought that that witness might have been, you know, might
14  have implicated that particular product.
15         And maybe there was a diagram that showed that
16  product was there during that time frame.  I don't know,
17  something like that.
18         You know, that would be potentially some basis.  But
19  that's what I'm thinking about.  Okay.  Now the next one is
20  B-2, and that relates more specifically to -- I guess it's --
21         (Pause)
22         THE COURT:  Okay.  Well, Mr. Cascino, let's talk
23  about Quad Cities evidence -- right that's -- my understanding
24  is -- Joel's reminding me that we're talking now about your
25  requests for consideration of consolidation of discovery with

Colloquy
30

1  respect to, I guess it's GE products on this one.
2  Consolidation with respect to 30(b)(6) notice?
3          MR. CASCINO: Yes, Judge. Right.
4          THE COURT: Okay. Well let me give you what my
5  reaction is to that, and then maybe you can kind of bounce off
6  that. And this is your client, right?
7          MS. STUDEBAKER: Mr. Fonstad.
8          THE COURT: I'm sorry, Mr. Fonstad. Okay. Sorry.
9  I keep getting them mixed up. Okay. I think that the
10  question goes to the extent of the adequacy of the 30(b)(6)
11  notice. And we've written a bit on our views with respect to
12  that, you know, we think obviously it's consistent with what
13  the law is.
14          And I am not offended, and I would hope that you and
15  your client would not be offended, by a notice that might call
16  for a deponent for -- and for multiple situations, and
17  intersect a consolidation of a witness who would have
18  information with respect to what GE did at the Quad Cities
19  facility.
20          I don't know anything about the facility. But my
21  recollection is that there's something like 25 potential
22  plaintiffs in Quad Cities --
23          MR. FONSTAD: Yes.
24          THE COURT: -- facility?
25          MR. FONSTAD: Well there's only actually evidence of

Colloquy
31

1  3 in the motion, and we've dealt with that. We're -- I
2  haven't seen these other 22 from Mr. McCoy so --
3          THE COURT: Well, okay. Well, obviously, he's got
4  to tell you who the plaintiffs are.
5          MR. FONSTAD: That's one --
6          THE COURT: Okay.
7          MR. MCCOY: They may not be all cases were GE
8  the defendant, but they're cases of people working  at Quad
9  Cities.
10          THE COURT: But, to me, I mean, we've looked at this
11  30(b)(6) issue in connection with particular individual cases.
12  All right? And we've entered some rulings with respect to
13  particular individual cases. So I don't see anything wrong
14  with letting, you know, let there be one notice, or you could
15  -- might it affect -- pertain to multiple areas that the
16  witness needs to be prepared for. You might designate more
17  than one witness. I don't know, it's up to you, obviously,
18  under 30(b)(6).
19          But, you know, to the extent it can be done at one
20  time, why not let it be done at one time? If his notice has
21  the requirements that I think our previous rulings have made
22  fairly clear with respect to particularity and the extent of
23  that, and what the basis is for him to believe that, you know,
24  your products are involved and that's -- to me, it goes to the
25  question of the adequacy of the notice.

Colloquy
32

1          And the fact that it might call for -- or might
2  relate to, you know, 3 witnesses, or even 20 witnesses, I
3  don't -- I mean, that's a -- that's a problem of
4  quantification, not qualification. That's the way I see it.
5          And that's the way, you know -- whatever rulings we
6  come out on this will be very much centered around that
7  concept. Do you want to give me some push back?
8          MR. FONSTAD: That's -- I mean, no, I don't, because
9  that actually wasn't at issue in any of the Quad Cities's
10  briefing whatsoever. The issue is not whether or not GE
11  objected to this notice being done in 3 cases.
12          THE COURT: So what is the issue?
13          MR. FONSTAD: Well the issue is, again, it's a scope
14  issue in terms of the plaintiffs were not working around the
15  various products. So that background on Quad Cities, even
16  though the motion the defendants have is off the table, is my
17  understanding, based on the --
18          THE COURT: Oh, well then don't -- let's not -- I
19  don't need to worry about it.
20          MR. FONSTAD: Okay.
21          THE COURT: If it's off the table, I don't want to
22  put --
23          MR. FONSTAD: But, anyway, just generally speaking,
24  then. In any case, any job site, as long as there's some
25  evidence tying the plaintiff to the particular product, be it

Colloquy
33

1  a turbine, be it a specific type of electrical product,
2  something like that, it's fine for us if there are multiple
3  plaintiffs who are around that same product --
4          THE COURT: Yes.
5          MR. FONSTAD: -- to do a deposition that applies to
6  all of them. That's never been our objection. Our objection
7  to the 30(b)(6) is -- so far have been -- they've been way too
8  broad, asking for like every document GE has, or is going to
9  testify --
10          THE COURT: And we've dealt with that.
11          MR. FONSTAD: Yes. And since that --
12          THE COURT: Your belief is, he's not been responsive
13  to --
14          MR. FONSTAD: Well since that point in time, since
15  they've been dealt with, we've received one new 30(b)(6)
16  notice from plaintiffs in the Woods and Jurglanis cases, where
17  GE has not responded to it. But we believe that that notice,
18  as well, doesn't address your prior orders, or the recent
19  order from Judge Angell, the Jasad (phonetic) case.
20          Again, which is that you need to tie a plaintiff to
21  a product to keep it up, yes.
22          THE COURT: Okay. All right. Okay. Good. So I
23  don't think we need to do anything more on that. The question
24  of the consolidation of expert reports. I'll just carry on,
25  and ramble on, and sort of opine about general thinking with

---

1    respect to that.

2              And my reaction would be, number one, I do not have

3    a knee-jerk reaction that says, no, you can't do it.  My

4    reaction would be, what is the nature of the expert report?

5    What type of expert is it?  What's the opinion?  And is the

6    opinion sufficiently particularized to have applicability to

7    more than one case?

8              Now it seems to me that, if you're talking about

9    anything that relates to medical condition and causation

10   issues relating to medical conditions of particular

11   plaintiffs, pretty hard way to see that you're going to be

12   able to have one medical person that's going to say more about

13   the more than one plaintiff, unless you just set it up as this

14   is the general proposition with respect to the way the disease

15   conditions were, and the effect that it has upon people, and

16   the effect of aging, and whatever effect that you have.

17             But obviously there's going to have to be one big

18   section that would say as to this plaintiff's medical history,

19   which is this, this is my opinion as to this plaintiff's

20   medical history, it's this, it's my opinion -- you know,

21   something like that.

22             And if you did something like that, and put it in,

23   you know, in one report, I'm not sure the defendants would

24   object.  And if they did, I'd want to know why.  You know,

25   again, as long as there's within the body of the report enough

---

1    particularity that it's sensible with respect to the way in

2    which a defendant can respond to it.

3              Industrial hygiene issues, which I know a little bit

4    less about then -- not that I know a lot about the medical,

5    but we don't deal with those quite as much.  But certainly a

6    report that might go to some description of the impact of

7    conditions in a particular location, at a particular time, if

8    that's going to -- that seems to me could very well apply to

9    two or three different witnesses, or plaintiffs, or 10

10   plaintiffs, I don't know, potential.  If it's particular

11   enough, it could apply.

12             But to the extent that the industrial hygiene work

13   also relates to the medical -- something about the medical

14   condition, or it's dependent upon, or reactive to the medical

15   issues of a particular plaintiff, maybe not.

16             I don't know enough about the industrial hygiene

17   expert work to know about that, because I've not dealt with it

18   very much.  That's kind of my general thinking about this.

19   Anybody -- yeah, Mr. Lauth.

20             MR. LAUTH:  Your Honor, one thing that may be

21   helpful -- personally I'm not on behalf of my client, as you

22   seem to be, I don't have a knee-jerk reaction against it.  But

23   I think I'd like to see what it is that he's conceivably

24   planning on doing.

25             So to the extent that the report that you conceive

---

1    -- hopefully want to use is generic in nature, if you could

2    produce, you know, a draft up, for example, that may be able

3    to give us some inclination as to where you're going with it,

4    such that we know what we could give to our experts, and we

5    know how to use it in the context of a case, I mean, it sounds

6    like a potential efficiency mechanism that may help us out in

7    terms of the overwhelming burden that it's going to be to get

8    all the expert reports.

9              For example, CVLO 3's got, you know, 100 plaintiffs

10   in it, or something like that.  And that's going to be a huge

11   burden for all of our experts, plaintiffs and defense alike.

12   If we could perhaps see a draft and work, you know, in the

13   context of maybe getting an idea of what you're planning on

14   doing, and whether, you know, if we accept this from you and

15   you accept, you know, something similar from a defendant.  And

16   even perhaps with the right to supplement saying, you know,

17   should we get past remand, and are in front of a transferor

18   court, you know, maybe you want to sharpen the pencil a little

19   bit, and we can provide for that, you know, after the fact for

20   the two or three defendants who may remain in the case after

21   dispositive motions.

22             It seems like a reasonable proposition to me.

23             THE COURT:  I'm not so sure I like what you said

24   about --

25             MR. LAUTH:  I know.  I knew you wouldn't like that.

---

1    And I went probably too far there.

2              THE COURT:  Yeah.

3              MR. LAUTH:  But maybe on the generic aspects we can

4    certainly talk about it.

5              MR. FONSTAD:  Just -- maybe there's a possibility,

6    Mr. McCoy, that you've done it in other litigations with a

7    similar report.  I don't know something like that might work,

8    where it's been accepted by the parties, obviously, and the

9    Court absolutely.

10             Maybe you can do that.

11             My only concern is, we already have generic reports.

12   So, for example, you guys had your pipefitter your -- so you

13   have Joseph Parity, you have William LaPoint, so you have kind

14   of your "product experts."

15             And those guys have generic reports that you served

16   the exact same report in every case.  And then your IH, Mr.

17   Conrad, he has a generic report that runs through all the

18   data, and then he creates a case -- a specific report where he

19   says, this guy had this exposure, he's based on the studies,

20   he had significant exposure to asbestos.

21             So I'm not quite sure what new generic reports

22   you're looking -- what exactly are you proposing that's

23   different?  Because I think we need, for the MSJs especially,

24   for potential Daubert motions, which would then exclude

25   causation evidence and give a defendant a summary judgment

Colloquy 38

1  grant, I'm not quite sure what new generic things are
2  different from what's already being done.
3          MR. MCCOY:  That's probably the reason why we think
4  that the reports need to be consolidated, and what you just
5  said, most of it's already been said and done by the experts,
6  the only difference is the name of the pipefitter or the name
7  of the boilermaker.
8          And I don't mean to make it too simple, but because
9  there are, as the Judge pointed out, the individual causation
10  differences.  But if you take out the individual causation
11  from the medical records, and the asbestos getting in the air
12  at a job site through the activity of the pipefitter, is an
13  industrial hygiene concept, it's generic to everybody who's
14  around it, using it, or is a bystander.
15          And that's what these reports would deal with, is we
16  basically had a job site for a type of product and equipment,
17  this is the characteristics about how asbestos would affect
18  everybody within whatever boundary lines are drawn by the
19  expert report.
20          And that -- that's how I perceived it.  And going a
21  step further, I mean, yeah, there aren't enough experts in the
22  asbestos world that accommodate this number of cases, unless
23  you do something about it.  But that's on both sides, I think.
24          The other thing would be that when you get to the
25  summary judgment in the case, and the idea would be to rule on

Colloquy 39

1  your Daubert type issues and (inaudible) report for a lot of
2  cases.
3          THE COURT:  Yeah, maybe.  Mr. Fonstad?
4          MR. FONSTAD:  The only concern I have is that, I'm
5  perfectly okay with -- I think all defendants do the generic
6  report too, where we have someone to just talk about what a
7  product is like, for example.
8          THE COURT:  Right.
9          MR. FONSTAD:  But once you get into the unique
10  record of a case --
11          THE COURT:  Right.
12          MR. FONSTAD:  -- it matters a lot.  Let's say a guy
13  working on a turbine.  If the guy was around the turbine when
14  the shell was on, he's not going to be exposed to asbestos.
15  If he was just walking by on the plant floor while that was --
16  or while work was being done even on the low pressure part of
17  the turbine.
18          But -- so a lot of the specific exposures, which is
19  what, you know, the cases turn on, we require specific reports
20  for each case.
21          And so I think -- I don't think there's any
22  objection to a generic report saying, I have a guy who's going
23  to talk about, you know, a turbine and -- or I have a guy who
24  can say, I know that IHD, you know, that generally is out
25  there.

Colloquy 40

1          But once someone is going to be offering at trial an
2  opinion that this data compares to this particular witness,
3  for this particular exposures, that's where I think we need
4  the case specific reports, so we can do the Daubert motions.
5          THE COURT:  The one thing I would -- the one thing I
6  would caution you about, frankly, is that not to forget, you
7  know, your first, or second, or third year of law school
8  mantra.  The objective of all these briefings is not necessary
9  to make it easy for you all, it's to make it easy for the
10  Judge who has to decide it.
11          And I wouldn't want to have Judge Robreno hear that
12  I sort of put the stamp of approval on something whereby you
13  got a big, massive report, and say you've got to go through
14  this report and figure out which part of it pertains to
15  witness -- you know, pertains to this particular plaintiff.
16          So when you've got to be responsible for managing --
17  which is why I had thought that maybe the way to do this is
18  not so much one big generic report, but one section that, you
19  know, you just cut and paste and plug into all your reports.
20          Which maybe you kind of do that already anyway.  And
21  so that might make this issue not that big of a deal.  Because
22  just part of the -- what I wanted to find out from you, Mr.
23  McCoy, in terms of, you know, what you were thinking of, and
24  maybe Mr. Lauth's suggestion is a good one, is to give some
25  kind of a draft with respect to that.

Colloquy 41

1          MR. MCCOY:  That's fine, Your Honor.  I agree with
2  that.
3          THE COURT:  All right.
4          MR. MCCOY:  And we would send that essentially --
5  for everybody.
6          THE COURT:  All right.
7          MR. MCCOY:  Especially like the (inaudible).
8          THE COURT:  Yes.  Because, I mean, you know, there's
9  a burden on everybody, and there's burdens on us.  And it's
10  piling up for us, too.
11          MR. MCCOY:  So many Daubert motions on Dr. Frank.
12          THE COURT:  All right.  I -- there's a question here
13  about the redundant and premature discovery, which I just have
14  a question on this next -- I'm not sure whose agenda that was,
15  but somebody raised questions about it.  So let's -- who
16  raised questions about that, and what's the issue?
17          MR. MCCOY:  That was from plaintiffs, Judge.  And I
18  have not a lot more to say about it because I've raised it
19  before, so I'm not going to restate the --
20          THE COURT:  I mean, to be honest --
21          MR. MCCOY:  It's basically the medical and the
22  bankruptcy and (inaudible) question yet that asks us before we
23  even investigated the case to admit that we really don't have
24  evidence.  But that's it, Judge.
25          THE COURT:  All right.

Colloquy                                    42

1  MR. MCCOY:  I mean, that's why I've got it on there.
2  THE COURT:  All right.  And the 30(b)(6) notices and
3  depositions, is there anything we need to talk about on that
4  issue, beyond what we've already said in the context of the
5  discussion above under the Quad Cities GE dep that got
6  noticing?
7  MR. MCCOY:  Let me just check my notes, Judge.  I
8  don't think so.  I had -- I guess I had one other question on
9  that item when it comes up.  And that is depositions of -- at
10  the deposition itself, and I will say that the last deposition
11  of the GE turbine expert was, I don't think there was an
12  objection by defense counsel so, I think we got something out
13  of it about ten days ago.
14  THE COURT:  Mr. Fonstad maybe wasn't there, is
15  that --
16  MR. MCCOY:  Well he's directing the traffic, he
17  indicated to me, so whatever, they had an attorney there, but
18  that -- it was -- it went very smoothly.  So --
19  THE COURT:  Good.  I like to hear that.
20  MR. MCCOY:  -- but the question of -- that we have
21  seen sometimes in depositions, is that the objection is made
22  that the witness -- that the question is outside the scope of
23  what this witness is designated to testify about.
24  Which I understand the objection.  I'm not saying
25  the objection is a valid objection, but if that's going to

Colloquy                                    43

1  occur, I would like to know up front, which we often sometimes
2  get, which topics in the notice this witness is going to
3  cover, and then which topics would be covered by another
4  witness.
5  So we would know that up front, rather than find out
6  at the deposition that, oh, we're going to need more
7  witnesses, and then it takes another month to get that guy
8  scheduled.
9  I'd like to know that up front when we serve our
10  notices, that the appearance of three people are going to
11  be covering these topics, and here's the one would cover --
12  THE COURT:  Well they're obligated to do that under
13  the Rule.  They've got to file a response and -- that's how I
14  understand it.  What -- has there been a problem with this
15  from your end?
16  MR. MCCOY:  It's not so much that it comes up all
17  the time, but it does come up and then --  and that's all I'm
18  saying, Judge.
19  So, I mean, I -- that's all we ask for is that that
20  be up front.
21  THE COURT:  Okay.  All right.  Now let's go back to
22  the A, discovery supplementation questions.  And I guess I'd
23  ask -- is it you, Ms. Studebaker?
24  MS. STUDEBAKER:  Yes, sir.
25  THE COURT:  All right.  Just give me the -- just to

Colloquy                                    44

1  make sure that I'm keyed in on the right -- which aspect of
2  this, on A-1, your motion's in the --
3  MS. STUDEBAKER:  Well we filed a motion to strike
4  the 719 page disclosure that CVLO provided to us June the
5  12th.  Which is -- there are a number of different issues with
6  it.
7  One was that for a number of the groups of cases the
8  top ten, obviously, CVLO 1 and 2, discovery had already closed
9  before we even got that disclosure.
10  In the email that we received from CVLO, it stated
11  that this was supposed to be a supplementation for the
12  interrogatory responses for all of the plaintiffs.  So,
13  obviously, to us, it appeared that they were trying to
14  supplement the discovery responses for plaintiff's cases that
15  were al -- that where discovery -- fact discovery was already
16  closed.
17  For the subgroup 3 cases, and, obviously, Your
18  Honor, this is a full copy of it, if you'd like to see it.
19  THE COURT:  Well I had -- I don't really want to see
20  all of it, but I want to give some examples.  And I think
21  Lauren gave me some, and I want to make sure that it's the
22  same as -- yes.
23  MS. STUDEBAKER:  And you've got two different lists,
24  as you see, they're separated.  One is the site workers by job
25  site, which basically just lists the person's name, the job

Colloquy                                    45

1  site, their address, and whether or not they're represented by
2  counsel.
3  That's all the information he gives us.
4  THE COURT:  Now my understanding is, this was
5  presented to you as a supplementation to the standard
6  interrogatories that were propounded, what was it, like in the
7  fall of 2010?
8  MS. STUDEBAKER:  Yes, sir.
9  THE COURT:  And were under Judge Reed's order.
10  MS. STUDEBAKER:  Reed's order.
11  THE COURT:  The agreement, whatever.  To be answered
12  -- Mr. Drumke always reminds me of the date.
13  MS. STUDEBAKER:  February 21st of 2011.
14  THE COURT:  Okay.  February of 2011.
15  MS. STUDEBAKER:  Yes.
16  THE COURT:  Right?  Okay.  Was there, or what I'm
17  not clear about, and I'm not sure if I asked Joel about this,
18  was there, or was there not a mechanism whereby -- when you
19  were with Judge Reed, whereby a party could ask for any
20  particular legal relief, or order compelling answers to
21  interrogatories, or relief from a failure to answer
22  interrogatories?
23  MS. STUDEBAKER:  The only part of the order that I
24  recall, in terms of answering the interrogatories, was
25  obviously, they were due.  The plaintiffs asked for an

Colloquy 46

1  extension, they were due in February.  And that the plaintiffs
2  were to answer those without further objection.
3       So we expected to have full answers to all the
4  interrogatories for all the plaintiffs by the February 2011
5  date.
6            THE COURT:  Okay.  But you didn't get them?
7            MS. STUDEBAKER:  Right.
8            THE COURT:  And was there some kind of an extension
9  granted?
10           MS. STUDEBAKER:  No, sir.
11           THE COURT:  Or was it was just not done?
12           MS. STUDEBAKER:  There was an initial order that
13  required -- that entered the interrogatories, adopted them,
14  and required the response, those first 9, I believe, by October of 2010.  The
15  plaintiffs asked for an extension, which was granted, and that
16  gave them that February of 2011 date.
17           THE COURT:  Okay.  And from 2011, when the answers
18  had not been provided, under -- because Judge Reed was still
19  involved from that point until, I think I got involved roughly
20  the end of May, as I recall.
21       Sometime in May of 2011.  Up to that point, did the
22  defendants take any action with Judge Reed with respect to
23  seeking to compel responses to those interrogatories?
24           MS. STUDEBAKER:  That I cannot answer, because I was
25  not involved until the time you became involved.

Colloquy 47

1            THE COURT:  David?
2            UNIDENTIFIED COUNSEL:  We raised it.
3            UNIDENTIFIED COUNSEL:  It was raised more than once.
4            MR. SETTER:  Every time we had a conference about
5  that we are not getting these interrogatory responses, and it
6  would be deferred and Mr. McCoy and others were saying they
7  were working on it.
8            THE COURT:  Okay.
9            MR. SETTER:  The focus shifted to the top 50 cases,
10  or whatever, right about that time, is what happened.  And
11  that was the --
12           THE COURT:  So then, when I came in, I don't
13  remember the first scheduling orders, but July, I think, June
14  or July, was the initial scheduling order?
15       And certainly I -- I don't know what -- if it was
16  ever specifically addressed with respect to any orders to
17  compel.  Does anybody remember?
18           MS. STUDEBAKER:  I know we raised it, Your Honor,
19  repeatedly, with you.
20           THE COURT:  Yes.
21           MS. STUDEBAKER:  That's --
22           UNIDENTIFIED COUNSEL:  There was no -- there was no
23  orders entered, just we had the deposition protocol came into
24  play and the deposition protocol was only for the depositions
25  that were going to occur.  And I don't even remember if it

Colloquy 48

1  required standard interrogatories, or not in the first
2  protocol, but --  (All talking at once)
3            UNIDENTIFIED COUNSEL:  No, no, no.
4            UNIDENTIFIED COUNSEL:  Well what --
5            MS. STUDEBAKER:  Yeah, it did.  It did, absolutely.
6  It did.  That's part of the issue.
7            UNIDENTIFIED COUNSEL:  We were not getting
8  interrogatory answers.
9            MR. MCCOY:  Right.  But I can say this, that it was
10  our understanding that those first 9, we had to get those
11  standard interrogatories done.  And then there would be
12  scheduling of all the other cases, and that's how we saw it.
13       And that would be -- take care of those other cases.
14  I mean, that was the transition that occurred.
15           THE COURT:  Okay.  And by asking these questions, I
16  don't mean to imply that I think that there is necessarily an
17  affirmative obligation that a defendant has to file a motion
18  to compel.
19       In other -- or, you know, for their failure to file
20  you guys skate free.  I'm not suggesting or imply that.  I'm
21  just trying to get refreshed on what the status of it was.
22           MR. MCCOY:  There was, at least from our
23  perspective, I'm not saying that it was wrong, or it happened,
24  but there was like an overnight transition from the mediation
25  to pretrial, trial.

Colloquy 49

1       That order came out very quickly and --
2            THE COURT:  What do you mean?
3            MR. MCCOY:  Well when you took over, you were
4  assigned to mediate, just like Judge Reed.  And that's what
5  the order from Judge Robreno said.
6       And then about two months later, that was April I
7  think when you came in.  And then about two months later, the
8  order came down from Judge Robreno changing your role to trial
9  and pretrial and discovery, dramatic change.
10       So we were no longer just negotiating cases, now we
11  were in a trial mode, and that change occurred.
12           THE COURT:  All right.  So, in any event, this
13  information was simply provided to you without any
14  explanation, other than it was meant to be a supplementation
15  of?
16           MS. STUDEBAKER:  The standard interrogatory
17  responses.
18           THE COURT:  Have there been answers to the standard
19  interrogatory responses in -- was this served upon you with
20  respect to any case, or all CVLO cases?
21           MS. STUDEBAKER:  All cases.
22           THE COURT:  Okay.  So there was -- there had been
23  interrogatories filed on particular cases that were in the
24  particular early groups that were going forward, I think,
25  right?

Colloquy                                                        50

1    MS. STUDEBAKER:  That's right.

2    THE COURT:  Some of which with unverified answers,

3  and some were verified answers.

4    MS. STUDEBAKER:  Exactly.

5    THE COURT:  Okay.  But were there -- or are there

6  also -- have the interrogatories been answered in the later

7  groups?

8    MS. STUDEBAKER:  Not all of them.  No, sir.  They

9  have not.

10   THE COURT:  It's sort of hit and miss, is that --

11   MS. STUDEBAKER:  It is.

12   THE COURT:  -- what you're -- is that what you're

13  getting?  Are you -- do you have your -- do you have your

14  finger on -- the number, as I understand it, is something in

15  the order of 625, or something like that, remaining cases.

16   Do you have a sense, and I get the idea maybe you're

17  the one who pays attention to this, and keeps track of this

18  for the defense side, as to how many particular cases of those

19  625 have there been answers to interrogatories filed, whether

20  verified or unverified?

21   MS. STUDEBAKER:  No, sir.  And that's the problem,

22  because we track them slightly differently.  We track the

23  verified versus the unverified differently, because the

24  unverified responses, obviously, we're waiting for the

25  plaintiffs to either verify it, or add to it.

Colloquy                                                        51

1    I don't have a number on how many have been

2  answered, whether we believe them to be fully answered or not.

3    THE COURT:  What do you think the number would be,

4  Bob?

5    MR. MCCOY:  Signed off on by the clients, we --

6    THE COURT:  Either/or, or both.

7    MR. MCCOY:  -- provided them, with the expectation

8  that they would be signing, even though they haven't been

9  signed yet.  Since the change to the trial/pretrial

10  proceedings, I'm just ball parking, probably somewhere between

11  2 to 300 have been provided.

12   THE COURT:  Okay.  So that's --

13   MR. MCCOY:  A lot of it has to do with when somebody

14  has a deposition.

15   THE COURT:  Yes.  I understand that.  That's -- I

16  understand that's an accel --

17   MR. MCCOY:  And I would add one other thing, Judge.

18  This is the actual email that was provided with the order I

19  think that that was actually --

20   THE COURT:  Yes.  I think I did see that.

21   MR. MCCOY:  That's -- we did explain what we were

22  doing.  But I'd say that's the number that would actually be

23  answered or --

24   THE COURT:  I'm not sure if I saw that exact

25  document, but I understand.  I understand that's the

Colloquy                                                        52

1  information.

2    Okay.  So as of this point, then, is it the case

3  that on the, say, approximate 625 remaining cases, that for

4  more than half of them the interrogatories have still not been

5  responded to, either verified or unverified?

6    (Transcriber change)

7    MR. MCCOY:  Probably -- probably in that range,

8  right, and then, of course, most of the cases are in the later

9  groups.

10   THE COURT:  All right.  I'm not going to make any

11  further comment about it, just --

12   MR. CASCINO:  Can I take a break -- get a break, you

13  know, to make a phone call and see maybe if there are those --

14  I don't know if they can give me those numbers or not.  If I

15  can find out whether --

16   THE COURT:  Yeah, sure, you can --

17   MR. CASCINO:  I'm not sure about -- I don't know if

18  Bob is sure about the estimates that he's given that so --

19   THE COURT:  It's okay.  It's not -- I'm just trying

20  to get a raw sense of it, but I'm happy for you to do that at

21  a break.

22   MR. MCCOY:  Judge, I'd like to just make one more

23  comment on this because it's -- the answers, you know, the

24  preparation of these answers were on a case-by-case basis,

25  requires a lot more than just the client.

Colloquy                                                        53

1    If -- if all we're saying is the client has no

2  knowledge of a lot of these things, which is the case, given

3  that a lot of them are dead, that's pretty easy, but the

4  extent, as attorneys can, we're called upon and prior to

5  someplace, state what we know to be based for the claim

6  because a, you know, the client doesn't know that that turbine

7  is a G turbine, but we as attorneys know that job site it is.

8    That -- that attorney information is -- is probably

9  somewhere on the order of 90 percent of the information that

10  will be pertinent to these answers.  That's what takes the

11  time to compile an investigation of that, you know, it is --

12  as -- as you know from other filings, it's been ongoing at our

13  firm in a very -- very intense way ever since we got into the

14  pretrial trial mode.

15   THE COURT:  Well, how do you -- I mean, to be

16  honest, how do you square that with the attorney obligation at

17  the time of the filing of the complaint to, in effect, certify

18  if it was good faith basis to believe that the allegations in

19  the complaint are accurate?

20   MR. CASCINO:  Your Honor, I --

21   THE COURT:  You know, substantiate it.

22   MR. CASCINO:  That's very easily answered.  The

23  problem is this has been 20 years.  A lot of folks have died.

24  Plaintiffs have died, co-workers have died.  We're no longer

25  are able to use, for example, a dead plaintiff's, you know,

Colloquy 54

1   statement that he gave us or attorney-client privilege
2   documents that he gave us because the litigation's gone out 20
3   years when -- and we were not able to do discovery during
4   those 20 years.
5           THE COURT:  I'm not so sure about that, but I
6   understand that that's -- that's what you guys think, and --
7   and that may very well have been the way in which the lawyers
8   were operating.  All right.  Okay.
9           MR. McCOY:  If we had -- if we had a pipefitter who
10  worked 30 or 40 industrial sites, we would have good faith
11  reason to believe he was exposed to every -- every asbestos
12  product that was used in those kind of settings.  I think
13  that's where asbestos litigation has -- has its roots, is
14  that, you know, there's a wide variety exposed to sub-travels
15  (phonetic).  That's our good faith belief as plaintiffs'
16  counsel, and that's the science.
17          But having said that, Judge, you know, we can
18  certainly say what we know today in these answers and keep
19  generating these as quickly as we can.  We got -- we got more
20  focus on this now because, as -- as you saw, our data keeps
21  getting better.  It's easy to generate these answers now.
22  We can say we know now.  It's just that there may be more down
23  the road that we are learning, and in the next -- as you get
24  into these -- as you get into a witness, okay, first off, you
25  call a guy on the phone, and you -- you got to get friendly.

Colloquy 55

1   These guys are eighty years old.  Okay?  They don't want to
2   be involved in legal proceedings, you know.
3           And you say -- you're talking, and you say, "Hey,
4   you know, Mr. Smith, you know, my name is so-and-so.  I'm a
5   legal assistant for Cascino, Vaughan.  I want to talk to you
6   about this.
7           And, "Oh, well, you know, I can't remember anything.
8   No, I don't want to get involved."  That's the first problem.
9           So you get past that and you get -- get to these
10  guys talking, and they start talking about, "Well, yeah, I
11  guess I did work at this place.  Yeah, let me think about
12  that.  Maybe it was a GE or a Westinghouse turbine.  Think
13  about it,  you know, call me back."
14          So then you call him back, you know, and -- and the
15  guy's wife answers and says, "Well, he really doesn't want to
16  talk to you."  Okay.
17          And then -- and then you got to -- you got to get
18  another call back to get around that.  And this is -- this is
19  frequent.  You say -- so you get -- you get -- you get the --
20  you get during the work-up phase several calls, and finally
21  the guy is starting to give you a lot of information that he
22  really does know because he's been a pipefitter for years
23  (inaudible), which is common to many of our clients.
24          So the guy starts talking to you, gives you a bunch
25  of interview notes.  You got your work product, your interview

Colloquy 56

1   notes.  Okay.  And that -- that information then expands our
2   knowledge greatly on certain things.
3           The next phase is that -- is that you schedule the
4   guy for a deposition to do.  So you go and you start working
5   for a deposition, and then the information gets even more
6   specific when you're talking about what he really does and
7   doesn't remember.
8           Then you go meet with him face to face the day
9   before the deposition, and you -- 'cause he's been a long ways
10  off, and you can't (inaudible).  You meet with these guys face
11  to face after what they told you before, they might be able
12  to -- to, you know, hold up to the standards of -- of the best
13  of his recollection, whatever it is in these depositions, but
14  there's another half that he remembers.
15          So then you know pretty much what he's going to say
16  the night before.  Then you go to his deposition, and he still
17  maybe gets 75 percent of it out, and he may remember more at
18  his deposition.
19          So it's this whole process that's ongoing throughout
20  the time when you start working with the witness, and then he
21  testifies, and -- and as Mike said, yeah, we worked with these
22  guys 20 years ago when a lot of these complaints were filed.
23  There was a lot they knew 'cause they were -- they were --
24  their memories were fresher.  Today they're 80 years old
25  instead of 60, and they're just so reluctant to get involved,

Colloquy 57

1   and once you get with them, 'cause their memories have aged,
2   is -- is -- you don't know until you take that final
3   deposition what you really got.
4           But having said that, Judge, we're certainly trying
5   to disclose what we know now, based on all these many
6   interviews we've been conducting, to see what is left of these
7   people's memories that started 20 years ago, and we're using
8   that to be able to work quickly to efficiently generate that
9   information so -- so that the remaining ones, I'm sure,
10  we'll -- we'll be continuing are continuing to answer, and I
11  got 10 or 12 answers on what I the call interrogatory 19,
12  which is a major statement through the whole thing of what are
13  the claims and what are the products and what are the brands
14  that's you make from one of our attorneys just the other day.
15  I don't -- I didn't normally get that many that quickly in the
16  past.
17          THE COURT:  Okay.
18          MR. McCOY:  And so I -- I've said a lot, Judge, but
19  I'm -- but I'm trying -- I'm trying to -- trying to tell you,
20  you know, we're -- we can say what we know immediately, which
21  in a lot of these cases they knew nothing, but the spouse knew
22  something that did come out.
23          The other hand, as in -- in as we've taken time to do
24  these right where we're using whatever attorney knowledge we
25  should be disclosing, then we'd have much better answers, and

Colloquy                    58

1  everybody knows what to do in preparation of that deposition,
2  because -- because we're doing -- we're doing more than just
3  that case.  We're actually combining what we think witnesses
4  are going to say so everybody can -- can work on that case
5  more efficiently.
6          MS. STUDEBAKER:  And whether there's -- I'm sorry.
7          MR. McCOY:  We don't want to be -- we don't want to
8  be pursuing cases where, like you say, that's not a GE turbine
9  case.  We got plenty of other, you know, defendants in most of
10  these cases that -- that we're certainly not looking to add
11  something that -- that -- that's -- hurts us, hurts -- hurts
12  the Court, primarily --
13         THE COURT:  Yeah.
14         MR. McCOY:  -- hurts the defense counsel, too.
15         THE COURT:  Yeah, I --
16         MR. McCOY:  So that's our philosophy -- not our
17  philosophy, that is actually what's going on at our office
18  every day.
19         MS. STUDEBAKER:  And that's what we're looking for.
20  We're looking for the specific information, not 719 pages
21  worth of data out of their database that doesn't tell us
22  anything about which plaintiffs that these witnesses may or
23  may not have testimony about.  They're -- the majority of them
24  are represented by counsel.  I looked at one this morning.
25  There were 84 witnesses listed for one work site, and 80 out

Colloquy                    59

1  of the 84 are represented by Cascino, Vaughan.
2          So even if we could -- if we had time and could
3  utilize that information, we can't talk to those witnesses to
4  try to find out.  We want the specific information from them,
5  not this kind of data dump that they've done to give us all --
6  all the information they have in their database 'cause that's
7  just not helpful for the work-up of the cases.
8          MR. McCOY:  Right.  And so -- so the data dump, as
9  you call it, was not for purposes of -- of the -- of the
10  specifics that I described earlier, but it was only for the
11  purposes in the way the interrogatory was written and our
12  concern about that.
13         Now, again, if -- if we know where the line is drawn
14  on this attorney knowledge, information that may be so careful
15  that we better -- because the question does ask for, "Tell us
16  all the names of people you know who are site workers, as well
17  as co-workers, who worked with" --
18         THE COURT:  How is the -- how is the --
19         MR. McCOY:  That's the question.
20         THE COURT:  How was the question phrased?
21         MS. STUDEBAKER:  They -- what they purport to
22  respond to are standards interrogatories number 16, 18, 20 and
23  29, and the language of interrogatory 20 -- he's -- Mr.
24  McCoy's correct that it does ask in interrogatory 16 through
25  18 about site workers, but interrogatory 29 specifically asks

Colloquy                    60

1  for individuals who have information about the individual who
2  is alleging some kind of harm.
3          THE COURT:  How is it -- do you have a copy of the
4  specific interrogatory?  Does anybody?
5          MS. STUDEBAKER:  We do.
6          THE COURT:  Good.  Thank you.
7          MS. STUDEBAKER:  Number 19 says, "For each of the
8  jobsites identified in interrogatory number 17 state the
9  following:  The types of asbestos containing products which
10  exposure is claimed, the brand name or trade name of the
11  asbestos-containing products for which exposure is claimed" --
12         THE COURT:  Okay.  I -- I got it.   The question
13  that I -- the issue that I'm concerned about, I mean not --
14  not exclusively, but the issue that I want you to focus on is
15  whether or not the specific question appears to ask just for
16  knowledge of a specific plaintiff, as opposed to facts upon
17  which the plaintiff through his counsel or otherwise, would
18  expect to be able to marshal in order to establish the claim.
19         MS. STUDEBAKER:  No.  I think it asks for all of it,
20  but it asks for, with specificity, not -- okay, we know that
21  these 84 clients that Cascino, Vaughan represented worked at
22  A.O. Smith.
23         What we asked for in the interrogatory is -- is the
24  individual information for each individual plaintiff, and then
25  linking that to the defendants that testimony could be offered

Colloquy                    61

1  about at those particular jobsites, which is exactly the kind
2  of information we're getting or we're talking about doing an
3  additional protocol for for the depositions.
4          THE COURT:  Is -- is "you" a defined term?
5          MS. STUDEBAKER:  I don't have the page of the
6  definitions.
7          THE COURT:  And are these -- while you're looking
8  for that, and anybody else can help me, are these
9  interrogatories that are standard interrogatories used in
10  what, Madison County or wherever -- what's --
11         MR. McCOY:  Originated --
12         THE COURT:  Where do these interrogatories come
13  from?
14         MR. McCOY:  Originated from Cook County.
15         THE COURT:  From Cook County?
16         MR. McCOY:  Yes.
17         MR. WATSON:  Your Honor, Brian Watson --
18         MR. McCOY:  Years ago.
19         MR. WATSON:  -- Owens-Illinois --
20         THE COURT:  Mr. Watson?
21         MR. WATSON:  Mr. Watson, right.  Thank you, Your
22  Honor.
23         THE COURT:  You're welcome.
24         MR. WATSON:  In the place of Edward Casmere.
25         Neither these standard interrogatories are used in

Colloquy                                                                 62

1   Cook County or Madison County (phonetic).  Just for a point of
2   clarification.
3        MR. CASCINO:  Your Honor, these were agreed to, and
4   Joel Lange, I think can verify this.  We proposed these to the
5   defendants.  They were a combination of the Cook County and
6   Wisconsin, as I recall, and the other side paved the -- sent
7   this set of interrogatories.
8        THE COURT:  Well, I mean look, look.  Look, the
9   bottom line of this is that, and I -- and I -- I'm not -- I
10  think I felt this when I was a lawyer, but I sure as heck
11  really feel it when I'm a Judge, is that, I mean, frankly,
12  lawyers play too many games with answers to interrogatories,
13  and I think my -- my instinct is everybody probably does it,
14  and obviously what needs to be responded to, it seems to me,
15  essentially is what are those facts that you believe establish
16  the predicate for the claim that's been made by the plaintiff.
17       And I'm just not -- I mean I'm frankly a little
18  puzzled, Mr. McCoy, to be honest, about your reliance upon the
19  District Court opinion from New Jersey that's 20 years old
20  'cause what I thought was articulated in that opinion is what
21  I understand to be the basic way in which we all operate.
22       And I appreciate that maybe people can parse out
23  words based upon the way interrogatories are specifically
24  propounded.  I'm sure I probably did it when I was a lawyer.
25  But it's not helpful to the process.  I would have thought

Colloquy                                                                 63

1   it's really not helpful to the process when you're dealing
2   with the kind of cases and the volumes in which you are
3   dealing with them and from the defendants from the -- from
4   the -- I mean the upset from the defendants is, appreciating
5   everything you said about your difficulty with respect to
6   establishing adequate specificity from your particular
7   clients, but I can -- I've told you a million times, I
8   completely understand that and have some sympathy for that.
9        But I think that the -- my -- my broad instinct is
10  that the law looks at this, not just with respect to that
11  concern, but also with respect to what impact it has upon a
12  party against whom the claim is being made.  And as I tried to
13  set out in the -- we -- we went to special effort in the
14  Unzicker decision to, you know, to write on this particular
15  topic, and I think we need to look at this in the perspective
16  of how much -- how much -- how is it impacted upon those who
17  receive the information, and I -- I have to say that when I
18  just see a -- a list of names, and if -- if our math is right,
19  and if you've got approximately -- if you got approximately
20  20 -- 20 names, and that might be a little bit shy, per page,
21  and you've got 800 pages, you're talking something like 16,000
22  names?  I mean something like that.
23       MR. McCOY:  I -- I don't know what the --
24       THE COURT:  I mean it's -- it's a --
25       MR. McCOY:  -- but it's -- I'm sure is 1,000.

Colloquy                                                                 64

1        THE COURT:  Yeah.  I mean I -- it's not -- it's
2   not -- well, yeah, sure it's 1,000.  I mean there's 20 page.
3   It's 1,000 times 20.  Maybe it's -- yeah, it's about 16,000.
4        MS. STUDEBAKER:  Yeah, it's 1398 work sites, so it
5   has to be more than -- I mean it has to be more 1,000
6   witnesses.
7        MR. McCOY:  But that is what our cases are about,
8   and some of these people are more than witnesses.
9        But as -- Judge, let me just tell you this.  If we
10  know what the line is for interrogatory number 19, what we are
11  and what we aren't supposed to do, like I say, a lot of this
12  is -- interrogatory 19 is 90 percent.  It's counsel's
13  knowledge that the clients know nothing about that.  We know
14  what that line is.  Going forward we will just comply with
15  that.  I mean that -- that's really what we need to know, and
16  that's -- that's our bottom line thought on this.
17       THE COURT:  Well, you know, I mean I -- I'm not sure
18  I want to tell you specifically where our line is in this kind
19  of sense, but I would say this.
20       If you want money from these people in settlement,
21  you darn well better tell them, with particularity, why you
22  think it is that their product was a factor in causing the
23  disease condition on your particular client, and you can't --
24  I would say that you can't, frankly, reasonably expect them to
25  just pay you money because your client might have been at the

Colloquy                                                                 65

1   same work site, broadly speaking.
2        And I -- I would think that one would be motivated
3   to provide as much particularity as you possibly can.  And I
4   understand you have limitations, and you try to work through it, and
5   you try to drill down on it, and you focus on the more serious
6   cases, obviously, higher value cases to you, and you give them
7   as much information as you can.
8        Mr. Setter.  Sorry.  Sorry.
9        MR. LAFFEY:  Jack Laffey, from Whyte, Hirschboeck in
10  Milwaukee, I represent Dow Tile Motion Industries and Playboy
11  in this litigation.
12       Aren't these standard interrogatories?  They're
13  standard interrogatories that the parties agreed to
14  promulgation of those interrogatories, but don't they apply to
15  case by case, plaintiff by plaintiff, which means that every
16  question that's asked relates to a specific plaintiff;
17  therefore, every response should relate to a specific
18  plaintiff in a specific case, and how in any set of
19  circumstances can 800 pages of witness document dumps relate
20  to one plaintiff as a response to an interrogatory?
21       It's a -- I think it's a simple process --
22       THE COURT:  You mean to be asking me this question?
23       MR. LAFFEY:  I'm asking you -- it's a rhetorical
24  question --
25       THE COURT:  Indeed it is.

Colloquy 66

1  MR. LAFFEY:  -- and I think what I meant -- tried to
2  frame it, because it seems to be a fairly simple process;
3  respond to questions for the cases, and everybody can move on
4  with some sense of certainty, rather than digging through a
5  morass of irrelevant information and clogging up the process.
6  THE COURT:  All right.  I understand.
7  Mr. Setter, did you --
8  MR. SETTER:  The only thing I would just add on,
9  Your Honor, back in the day of Judge Reed and these
10  interrogatories and when you came on board, I mean that's
11  exactly the reason that the interrogatories were being done,
12  is if they wanted us to settle, what are we going to settle
13  for, where are we at in what cases were even pending, what
14  defendants are aware of these products, et cetera, and -- and
15  I'm kind of shocked to hear that two or 300 of these --
16  THE COURT:  Try to -- try to tamp down the
17  hyperbole.
18  MR. SETTER:  Okay.
19  THE COURT:  I mean I'm not -- I don't need to know
20  about how shocked you are.  I assume you're shocked.
21  MR. SETTER:  But I -- I thought that was the purpose
22  of doing this much like AO-12 is the purpose of getting you
23  know, what's the medical criteria and then we are trying to
24  get to what is -- what is the product ID.
25  And here we are back --

Colloquy 67

1  THE COURT:  I don't -- you guys are kind of -- you
2  heard what I said about this, so you -- Mr. Lauth, do you have
3  anything that --
4  MR. LAUTH:  I do, and, hopefully, it will be
5  constructive again.
6  THE COURT:  Ask Mr. Spinelli if you want to really
7  ask the question.  Go ahead.
8  MR. LAUTH:  One of the things I put a marker down
9  on, and I called about month, maybe a month and a half ago
10  THE COURT:  Uh-oh.
11  MR. LAUTH:  -- is an attempt to try and streamline
12  this process.
13  What defendants need is who out of the 800 pages of
14  witnesses are they going to use at trial.  Who are you going to
15  respond to my MSJ on?  What -- I have a perfect scenario out
16  of CVLO 1/2(b).  It's the Frankenberger case.  They had no
17  I.D., going into our MSJ with any specificity.  We filed our
18  MSJ, and in response they pick a guy out of this list, and he
19  comes up with a product that had nothing to do with what we
20  had, you know, in our mind as what the exposure was going to
21  be at the close of discovery.
22  So you talk about surprise.  My client just wants to
23  know who you going to call at trial --
24  THE COURT:  Has that -- has that motion been ruled
25  upon yet?

Colloquy 68

1  MR. LAUTH:  No.  It's still in the briefing stage,
2  and we've replied -- I think it's fully briefed at this point,
3  but, you know, that's what we're trying to prevent.  We -- I
4  mean that's -- and that's how the rubber is going to hit the
5  road with the 800 pages.  We're going to file dispositive
6  motions.  They're going to come up with people that we didn't
7  depose because it's a stack of 800 people -- or 800 pages, and
8  say, "Well, you should have asked this guy this question."
9  THE COURT:  I assume you've reviewed other opinions
10  of Judge Robreno where that kind of issue has arisen.
11  MR. LAUTH:  I agree, but it's still very costly for
12  us to have to comply with that as the mechanism for operation
13  of these cases.  I mean that's a huge burden on our -- our
14  clients times hundreds of cases if that's how we're going to
15  proceed.  And so what I -- you know, what I suggested several
16  weeks ago is that perhaps we insert a deadline or come up with
17  some kind of mechanism to say, "All right, plaintiffs, who are
18  you going to use, really, in this case?  Don't give me 800
19  pages, give me eight people."  And those are the people we
20  need to be concentrating on working on, and then it devolved
21  into the, "Well, we got site workers I.D.", and that type of
22  stuff, which, you know, I question in -- in a lot of respects
23  how that helps them on summary judgment, as well.
24  But, you know, maybe we try and narrow it down that
25  way, get rid of the 800 pages, and let's focus and narrow down

Colloquy 69

1  on who you're actually going to use.  It's the same thing that
2  happened in Unsecker with the hundreds of co-workers
3  supplemented at the end of discovery.  It's those types of
4  things that we're trying to avoid because, you know, what
5  we're looking for is preparing these cases for trial.
6  THE COURT:  Mr. Cascino, you want to respond, or,
7  Mr. McCoy, you want to respond?
8  MR. McCOY:  Yes, Judge, again --
9  MR. CASCINO:  I think part of the problem, Your
10  Honor, and Mr. McCoy can respond, but part of the problem is
11  that the discovery schedule that the Court has put us on is
12  virtually impossible.
13  I think those were the comments that were made by
14  Judge Giles, that if we were to be in this, that it was
15  virtually impossible.  I think the case law in the Third
16  Circuit's on our side, the plaintiffs' side, in that matter.
17  This is overwhelming what this Court is requiring us to do
18  when there was 20 years that this Court did not allow
19  discovery to occur.
20  THE COURT:  All right.  Well, that's -- I mean I
21  understand that you've articulated that position one way or
22  another previously, and I understand that, and I -- whether
23  you've preserved it and are prepared to take any action on it
24  upstairs, you know, is up to you, but I'm working with the
25  cards that I'm dealt with as of this point.

Colloquy                                                                 70

1    MR. McCOY:  Judge, I'll -- I'll add further than

2  that.  Again, if we -- we know where the line is -- and I

3  remember this call Mr. Lauth was talking about, and I think

4  you've got -- or emails or whatever, there was going to be

5  discussions with us and Mr. Lauth on this issue, and I think

6  Your Honor had even said that as a result of one of the

7  Wednesday conferences, but it got -- it got waylaid, I think,

8  because then all the motions started coming in from all the

9  other defendants.

10    THE COURT:  I understand.

11    MR. McCOY:  They just -- there was -- there was --

12  that's what I remember, just -- I remember these -- these

13  conversations didn't happen.  So they should, and -- and I say

14  that because, again, yeah, we don't want to be just proposing

15  lists just to meet the requirements of this, what we -- what

16  we read interrogatory number 19 to say, site workers, because

17  it's the same thing, it doesn't help anybody to be efficient

18  in this litigation.

19    What we do want to be is to be is to be efficient, and we

20  want to try to get in the -- we make sure that they've got the

21  ability during the course of these -- of the work-up of all

22  these witnesses and the testimony that's ongoing that

23  something comes up that relates to one of these cases, we're

24  going to move to supplement whatever it is that we disclose,

25  and that way we can narrow our exposure.  Whether that

Colloquy                                                                 71

1  supplementation is granted or not, I'm just saying I would

2  expect that we would do that, somewhat like that Meyers v.

3  Pennypack case we cited, or are we going to do it, I'm sure

4  (inaudible) before trial no matter how late, but that's what I

5  would expect, and then that way we could come with a narrower

6  disclosure up front, providing that nobody comes back to us

7  later and says, "You know, you didn't -- you didn't comply

8  with the literal language of the rule, of, you know, of the

9  interrogatory."

10    So we -- if that -- if that's what where we're at, I

11  think that could be discussed in that -- all in that context.

12  I'm -- I'm not hearing anything from the defense or from Your

13  Honor that I have any -- less paper for the better.

14    THE COURT:  Well, okay.  I -- I'm not sure whether

15  or not there's much more I can say.  There are motions before

16  me that relate to this particular topic.  We will deal with

17  the motions as we've dealt with these other motions.  But I

18  am -- I certainly echo what you said and what Mr. Lauth said,

19  the importance of this, of particularizing, and it -- it seems

20  to me it obviously just goes to the imperative of prioritizing

21  those cases.  Where you need to develop information, get the

22  information as specifically as you can that you believe is

23  going to support your position for settlement and defeat

24  summary judgment and give them an opportunity to kick the

25  tires.  It's got -- it's got to be disclosed.

Colloquy                                                                 72

1    I mean the -- these interrogatories are a vehicle,

2  and they wish to do it, and that's why they pressed it on

3  the -- let's see, it's in the deposition protocol?  I'm not

4  sure I know what else to say about it than that.

5    Why don't we take a, say, a 10-minute comfort break.

6  We have bathroom facilities both right straight through on the

7  right-hand side if you know, but lesser known is if you go to

8  your left and around the corner, there are bathroom facilities

9  there, as well.

10    So we'll take 10 minutes and then come back and pick

11  up.

12    (Recess taken, 11:03 to 11:35 a.m.)

13    THE COURT:  Okay.  Let's look at the scheduling

14  order issues.  Think we're on the second page or the back page

15  if you don't -- Lauren's (phonetic) version of this which was

16  more environmentally appropriate than my version.

17    And I guess I need to hear from Mr. McCoy about

18  this, consolidating -- consolidating dispositive motion

19  briefing, CVLO 1/2 through CVLO 4.  All right.  Jobsites.  I'm

20  not -- I'm not sure exactly what you're proposing and how they

21  work and --

22    MR. McCOY:  Okay.

23    THE COURT:  Give me some help on this -- this is

24  what we sent around yesterday but apparently didn't get -- get

25  to everybody until late yesterday.

Colloquy                                                                 73

1    THE COURT:  Oh.

2    MR. McCOY:  My apologies.

3    THE COURT:  Oh.

4    MR. McCOY:  It's supposed to leave our office by

5  1:00.

6    THE COURT:  Just show me what you got --

7    MS. STUDEBAKER:  Here's --

8    MR. McCOY:  This is --

9    THE COURT:  I don't think I have --

10    MR. McCOY:  This it right here.

11    MS. STUDEBAKER:  There's a copy, too.  Okay.

12    MR. McCOY:  This -- this was -- this is our -- our

13  proposed grouping right here, which is a --

14    THE COURT:  Wait, wait, wait.  Let me just check.  I

15  think I have it.

16    MR. McCOY:  I printed it out, so --

17    THE COURT:  That's another copy I got?

18    MR. McCOY:  Yeah.

19    THE COURT:  All right.  Okay.

20    MR. McCOY:  So -- so that -- that's the proposed

21  grouping by plaintiff name, and this was a -- the docket

22  numbers, the -- right there, that -- so that was the

23  qualitative analysis that our -- our firm spent -- well, I

24  took awhile with this because we had to look and study about

25  what jobsites these clients were likely to have accrued

Colloquy 74

1  evidence on, and at this juncture, needed from three and four

2  groups and subgroup C, which is another group that our summary

3  judgment (inaudible).

4  So we looked at these groups, and we qualitatively

5  studied the jobsites that they were most strong at in their

6  evidence, and when -- when the defendants that would match up,

7  also, because they don't all have the same defendants in each

8  case.  We might have a good case against a defendant at a

9  jobsite, but you don't have that defendant in a plaintiff's

10  case.

11  So that -- that qualitative analysis was matching up

12  all these factors, which took, I -- I would -- I would say a

13  minimum, 20, 30 hours of staff time, and that's what we

14  promised to do in that Monday -- I mean Tuesday conference, to

15  complete that.

16  That's -- that is our best attempt at it as -- as of

17  this moment, and it -- what it does is it breaks the cases

18  down to the groups, seven groups of approximately -- can't

19  really -- 20, 21 or something like that.  Some of the groups

20  have a little more, some of them have a little less, but

21  it's -- the idea is to -- and so that when you look at this

22  from a -- a summary judgment briefing perspective that you

23  don't have to -- to look at motions for all kinds of

24  different jobsites, all scattered all over randomly throughout

25  a state, but, instead, you look at certain cases which have

Colloquy 75

1  common jobsites, and I just take that first one as an example

2  because it's easier just to explain the details.

3  So if you look at this Milwaukee area group --

4  THE COURT:  Uh-huh.

5  MR. McCOY:  Okay.  Oak Creek Power Station is the

6  dominant site so they went on there for clients in that area

7  in terms of total number of clients at this jobsite.  This is

8  a group of -- ends up being approximately 20 -- let's see, 22

9  cases.

10  THE COURT:  Okay.

11  MR. McCOY:  And a number of these clients have this

12  Oak Creek Power Station as a -- as a site where we believe

13  would be the primary evidence and a defendant that matches

14  that evidence.  So when those plaintiffs are listed over here

15  on that third column in the chart, so there's many of the

16  plaintiffs, and there's a group of 22 that are all Oak Creek

17  Power Station.

18  And then those plaintiffs we would prepare what

19  could be actually one brief about Oak Creek pertinent to all

20  of the -- like, you know, here's how Oak Creek -- here's what

21  happens at Oak Creek.  It's a powerhouse.  These are the

22  activities that go on, and here's the brand of products that

23  we know, turbines that are there.  Here's the -- here's the

24  companies that built whatever, of the eight units that there

25  are at Oak Creek, and we would be able to state that generally

Colloquy 76

1  for Oak Creek.

2  So instead of having to worry about Oak Creek being

3  in -- in the -- in one group that you're looking at now for

4  summary judgment and then having to relearn about Oak Creek

5  six months later, we've got most of our key Oak Creek cases

6  right here, and --

7  THE COURT:  So what -- what -- I guess what I --

8  this is -- this is -- thank you.  I think it may be helpful,

9  and it may be something that we can -- we can work with, I

10  don't know, but what is this -- what -- is this going to blow

11  up all the current scheduling orders that we have?

12  MR. McCOY:  What I believe it will do, Judge, is --

13  is to -- I'm just looking at the summary judgment applications

14  right now.  Okay.  It -- it's the summary judgments in these

15  cases as -- as if we -- as we got these set out or resolved,

16  and then there's approximately 150 cases that are in this

17  list, 150 to 160.

18  First off, individually, each case, I will -- I

19  would guarantee, you can put good money on that, it will take

20  about 30 percent of the time to actually decide these cases.

21  THE COURT:  Let me -- let me interrupt you 'cause I

22  think maybe you're not understanding my --

23  MR. McCOY:  Right, and then --

24  THE COURT:  I'm not asking my question properly.

25  MR. McCOY:  I'm -- I'm --

Colloquy 77

1  THE COURT:  Is -- my question's this.  You've got

2  these referenced in your -- the top thing, the CVLO group one,

3  two, three, four.  Do they correspond to our current list of

4  CVLO cases?  I mean --

5  MR. McCOY:  No, just -- these groups -- we put Roman

6  numerals.  These are -- these are new groupings.  They're --

7  but the cases are drawn from subgroup C, 3 and 4 groups that

8  we currently have.  So it will be the Roman numeral group

9  numbered cases.

10  THE COURT:  So how do you -- what's the relationship

11  between the way you have these groups and what our current

12  groupings are?

13  MR. McCOY:  Only -- the only relationship is that

14  we've drawn clients from subgroup C one and the current groups

15  three and four.  That's the only relationship as these clients

16  come from those subgroups.

17  THE COURT:  Subgroup C and of -- of CVLO --

18  MR. McCOY:  One and two.

19  THE COURT:  -- one and two.

20  MR. McCOY:  Right, and the current subgroups three

21  and four.

22  THE COURT:  Okay.  Do you -- what are the -- what

23  are the dispositive motion filing dates for those -- for those

24  groups, which I think -- I think we're on now.  Let's take a

25  look at that and see what --

Colloquy                                                                 78

1    MS. STUDEBAKER:  I have them, as well, Your Honor.
2    For subgroup C it's August the 6th.
3    THE COURT:  Yeah.  That's -- that's the initial
4    dispositive motion filing date.
5    MS. STUDEBAKER:  Yes, sir.
6    THE COURT:  Okay.
7    MS. STUDEBAKER:  For CVLO 3 it's October the 8th.
8    THE COURT:  Yeah.
9    MS. STUDEBAKER:  And for CVLO 4 it's October the
10   29th.
11   THE COURT:  What was group three again?
12   MS. STUDEBAKER:  October 8th.
13   THE COURT:  All right.  And so group C in the one
14   and -- subgroup C and the one and two is August 6th.
15   MS. STUDEBAKER:  Yes, sir.
16   THE COURT:  Okay.
17   MR. McCOY:  So that --
18   THE COURT:  When are you proposing that these
19   motions would be -- that the motions from your groupings would
20   be filed?  Is that part of your proposal?
21   MR. McCOY:  That was in that letter we sent earlier,
22   and the way that worked is that these would be done at 30-day
23   intervals, each group, and from the time that the motions were
24   filed there -- there'd be a period of 28 days for them to
25   respond.

Colloquy                                                                 79

1    The idea is the time frames, again, are to make it
2    less paper so you have more time to simplify, and you don't
3    restate what I commented before, I'm sure is -- is 80 percent
4    redundant statement summaries in the existing briefs, with the
5    idea that whatever has already been done and ruled on is, you
6    know, the objections and those arguments are all preserved and
7    carried forward, but you don't have to keep restating these.
8    THE COURT:  Yeah.
9    MR. McCOY:  So it's a combination of efficiency in
10   terms of -- of what the cases are that are in the group, which
11   is what I call the qualitative portion of -- of the selected,
12   and -- and a combination of taking into account this is
13   already what's been ruled on and not restating it.
14   THE COURT:  Yeah.
15   MR. McCOY:  We all live by that, but we preserved
16   our rights to object to it later on.
17   THE COURT:  Yeah.  By my count in what -- in our
18   groupings of subgroup C there are, I think, 37 cases, and CVLO
19   3, I believe there's about 50 cases, more or less, 50 cases.
20   And in CVLO 4 there's about 150 cases.
21   MR. McCOY:  Right.
22   THE COURT:  So that -- that's a total of about 237
23   cases.
24   MR. McCOY:  Some cases are unassigned, and we
25   actually have a cover letter on that, about 50 cases, which --

Colloquy                                                                 80

1    ss that what you're coming up with?  Here's a cover letter.
2    Our unassigned.
3    And that -- that would be -- I think this is the
4    remaining group right here that could be an in-sub-group that
5    are unassigned.  Let me just comment on that group briefly.
6    That last group that are unassigned, the reason that
7    they're unassigned is because we have so little information on
8    them that we can't really assign them qualitatively.  So the
9    chances are with that group that there may be quite a few of
10   them that don't have evidence or they're involved in Indiana
11   sites that would be -- be able to be pursued, 'cause they're
12   all Indiana sites.
13   So the reason why that group remains unassigned is
14   those are the ones that are less likely that we have evidence.
15   THE COURT:  So these are the ones that Mr. Setter's
16   been trying to convince you to dismiss, it sounds to me.
17   MR. McCOY:  Right.  We'll keep dismissing bit by
18   bit, but we do it.
19   THE COURT:  Okay.  Right.  Okay.  Well, I -- I think
20   what I was -- you know, I appreciate you've done something
21   here.  I think what I was -- wanted to see, also, was to put
22   what you've got together with what we now have.  I mean we
23   have a structure, and we've been working off that structure,
24   and the structure is, you know, we -- we set it up -- frankly,
25   as I recall, we set it up largely following your leads.

Colloquy                                                                 81

1    That's my recollection.  And I thought at the time maybe if I,
2    you know, we were -- we were front-loading on serious medical
3    conditions, and I think we got most of the malignancies in
4    CVLO 1, I think, the top 10 in CVLO 1.  I'm not sure about
5    that, but I think.  Maybe some of the later cases that are
6    going to CVLO 7, there are some malignancies.  That's my
7    general recollection.
8    And I'm -- I'm -- I mean I'm -- my instinct is
9    you've got to have a substantial reason to show why we need
10   to, you know, disrupt what we've now done.  And this might --
11   this might be one.  This might be one, but I want to look and
12   see how it relates to what we now have, and also, principally,
13   to demonstrate that it's not going to have a significant
14   impact on pushing our your dates beyond where they are.  I'm
15   not saying they couldn't be pushed out to some extent, but
16   pushing our your dates beyond where they are.
17   So I guess the part that I'm seeing that you've not
18   done yet -- maybe you have, and I just don't -- I'm not
19   visualizing it correctly or I -- I got to get it down on a
20   piece of paper somehow, on what this would mean with respect
21   to regrouping in terms of discovery that's been ongoing,
22   regrouping in terms of -- in terms of, you know, the
23   experts -- expert stuff that we're doing in connection with
24   them.  Does it impact upon the SAS procedure that we had
25   separately laid out, kind of on a separate track?  You

Colloquy                                                                 82

1  know, every time we make a change like that, there's often

2  unintended consequences, and I'm just -- I'm concerned about

3  that.

4          I applaud the concept, and I -- I guess I want some

5  reaction if the defendants even got a chance to study this,

6  but I do applaud the concept of trying to -- trying to do

7  groupings in a way that has this geographical context, and I

8  can understand how that might be helpful and, you know,

9  helpful to us, right?  But I'm just not -- I don't have

10 enough -- I don't have enough here in my own head to be able

11 to really appreciate how it's going to impact upon -- upon the

12 defendants.

13         Did you get a chance to talk about this with -- with

14 Ms. Studebaker or anybody on the --

15         MS. STUDEBAKER:  We talked about it briefly.  I had

16 not seen the proposal.  It obviously came when I was traveling

17 here yesterday, and the concern that I raised with Mr. McCoy

18 is the same concern that you are raising.  I wanted to take a

19 look at it and try to do the math on it and see how what he

20 was proposing would impact the current deadlines that we have

21 in place, and I just hadn't had the opportunity to do that

22 yet.

23         THE COURT:  Yeah, and I guess you've not -- you've

24 not, either.

25         MR. McCOY:  No, Judge.  You -- you're right.  I mean

Colloquy                                                                 83

1  we have -- we have discussed this fully, and it might be

2  something we could -- we could discuss amongst us a little

3  more.  I would say, you know, no impact on the SAS, in my

4  opinion, that's for sure, and that -- that one needs to go.

5          And in terms of a general time frame when all these

6  cases are going to get done and not impose a very long

7  extension at the end either, because, again, if we focus our

8  efforts on a jobsite, we, as attorneys and as Judges, can --

9  can in the same amount of hours do a lot more than we can if

10 we look at the jobsites.

11         So that -- I say that because of -- that's the whole

12 concept.  Now --

13         THE COURT:  I wish we had thought about that a year

14 and a half ago.

15         MS. STUDEBAKER:  Yeah.

16         MR. McCOY:  Well, I think -- Judge, I think it's

17 consistent, you know, as you --

18         THE COURT:  Maybe you said --

19         MR. McCOY:  -- said from the beginning of time we've

20 talked about consolidating -- consolidating these things.

21         THE COURT:  Yeah.

22         MR. McCOY:  Sometimes you -- we all know we go

23 along -- I think that's --

24         THE COURT:  You're on a what?

25         MR. McCOY:  I said we all know that we go along in

Colloquy                                                                 84

1  life, and I won't say any more than that.

2          And, you know, I -- so -- and that's true for

3  everybody.  So the -- but the -- but the -- at the end of

4  these cases it's just my -- certainly what I've seen already.

5  I mean what's left to decide, really?  There's nothing

6  (inaudible) business left to decide.  We -- you could -- if

7  you can in one paragraph say what everybody else in this case

8  is about, and it would already have been ruled on.  I mean the

9  guy's either a bystander or turbine, and it's been ruled on,

10 or he -- he's got a one-day exposure to GB joint compound

11 products, and it's been ruled on.

12         THE COURT:  Yeah.

13         MR. McCOY:  I mean it -- it's --

14         THE COURT:  Let me ask you about --

15         MR. McCOY:  There's really nothing left to decide,

16 other than to lay out the issues, and parties could almost

17 agree on the rulings.

18         THE COURT:  Let me ask you about this.  You've

19 got -- you've got down here in your groupings both plaintiffs,

20 and you also have a separate column for elderly site workers.

21 I guess are you meaning to say the column of elderly site

22 workers, those are going to be co-workers who you believe

23 would have evidence to offer that would impact upon the case

24 of those particular -- those particular plaintiffs, as to

25 those particular products?

Colloquy                                                                 85

1          MR. McCOY:  Yes, that's the --

2          THE COURT:  That's -- that's exactly what we were

3  talking about earlier, I would think --

4          MS. CHENEVERT:  Uh-huh.

5          THE COURT:  -- as a substantial step in the right

6  direction.

7          MR. McCOY:  Yes.  It all ties into providing data in

8  the way that saves everybody time and organizing the

9  depositions so everybody, you know, doing 303 depositions in

10 the same day.  That way we don't have to go through these --

11 I'll use the depositions in other -- some of these depositions

12 are each time a guy comes in, it's a new jobsite, and

13 oftentimes there are new attorneys present, and we go through

14 the same whole litany about, well, a turbine's built this way

15 and is built -- the same turbine that, you know, Unified at

16 Oak Creek built the same way, and the same people remember

17 being there, and --

18         THE COURT:  Yeah.

19         MR. McCOY:  -- how many witnesses do you need to

20 keep saying that?  So -- but the -- when you spread them out,

21 that's what happens.

22         MS. CHENEVERT:  Ms. Chenevert, if Mr. Drumke was here,

23 what would he say?

24         MS. CHENEVERT:  Well, I think important like --

25 trying to make these cases more efficient is certainly

Colloquy                                                                                              86

1  understandable, but it sounds like this would be moving away
2  from individualized case-specific analysis, and if I'm
3  understanding Mr. McCoy correctly and talking more, just
4  general site worker testimony about these work sites
5  generally, and, you know, we talked about multiple times on
6  the Wednesday conference calls, the need to still treat these
7  cases as individual cases.
8             And so I'm not totally certain that it's true that
9  we could have one brief that would deal with all of, you know,
10 Oak Creek Power Station necessarily.
11            THE COURT:  Is that what you're saying?  I didn't
12 hear that's what you were saying.
13            MR. McCOY:  No, I was -- I was saying that -- that
14 there's a lot of generalities about Oak Creek Power Station
15 that could be stated once, but -- but, certainly, the
16 individual plaintiffs have to be proved case -- case by case,
17 and that -- that section would be contained.  Whether one
18 brief or 20 briefs, it would be a section-briefed plaintiff as
19 to their specifics, not --
20            THE COURT:  David.
21            MR. SETTER:  I just have a pragmatic question, and
22 that's this.  On these various individuals, for example, Mr.
23 Aftler, he's one, two, three, four, five -- maybe six
24 jobsites.
25            THE COURT:  Right.

Colloquy                                                                                              87

1            MR. SETTER:  So I -- you know, I don't know.  How do
2  we proceed discovery?  We're going to proceed with discovery
3  in Allis-Chalmers with Mr. Aftler, then we're going to bring
4  him back another day about the Briggs & Stratton case is -- or
5  work site, then the Oak Creek Power.  I mean that just seems
6  like we're multiplying this, rather than consolidating it
7  because you're now splitting them by jobsite, and anybody that
8  works in multiple jobsites are going to have to show up
9  multiple times in multiple depos.
10            THE COURT:  No, we're not going to have that.
11            MR. SETTER:  I mean that's -- I don't -- I'm
12 pragmatic.  I don't know how this is going to work.
13            THE COURT:  What about that?
14            MR. McCOY:  Yeah, and what you're saying -- what
15 you're saying's right.  The plaintiffs don't want to -- so
16 that's the idea, is -- is if we have time to fit in all of
17 what a particular witness knows in terms of the number of
18 jobsites in a given day, that's -- that's the way we would
19 prefer to have it happen.
20            I mean normally the plaintiffs' exam on any witness
21 for a jobsite runs anywhere from 25 minutes to an hour.
22 That's about what we run.  The cross-examination, obviously,
23 from defendants goes up to keep it longer, but, you know, if
24 we could fit in a guy talking about his three jobsites, and
25 he's familiar with -- some of these guys are -- are good

Colloquy                                                                                              88

1  for -- are good for five to 10 jobsites, and that -- and
2  that's the whole point, is don't keep bringing them back
3  like --
4            THE COURT:  So that's what you've been doing now,
5  right?  You -- you depose a plaintiff.  He talks about his
6  exposure wherever it would happen to be.
7            MR. SETTER:  Right, which is --
8            THE COURT:  So why would that have to --
9            MR. SETTER:   Well, I was just --
10           THE COURT:  It's not going to change.
11           MR. SETTER:  Yeah.  Well, I just assume we're not
12 going to go into the circumstance that today we're only
13 dealing with the Oak Creek Power Station, individual
14 plaintiffs and co-workers, and then next week we got to come
15 back and deal with Port Washington --
16           THE COURT:  I certainly agree with -- I certainly
17 agree with that.
18           MR. SETTER:  And I just want to make sure that we're
19 not doing that.  So if we go in there, it's going to be if
20 this guy is -- first time he shows up, Mr. Aftler is Allis-
21 Chalmers, then we're going to have to take him on everything
22 that he's listed here in terms of all the defendants and all
23 the work sites.  I mean that has to be built into that
24 process; otherwise, it wouldn't work.  Same with plaintiffs.
25           MR. McCOY:  Most of the plaintiffs are dead.  We're

Colloquy                                                                                              89

1  really talking about the site workers.  But another -- another
2  example --
3            THE COURT:  I assume you got multiple site -- site
4  workers that are -- multiple jobsites.
5            MR. McCOY:  Right.
6            MR. SETTER:  Well --
7            MR. McCOY:  Another advantage to this -- this
8  breakdown, using the Milwaukee area as example, is, okay,
9  here's five of the Wisconsin electric power companies'
10 stations on this list.  That's -- that's -- the exposure, of
11 course, is that companies' stations and the practices and
12 procedures of that company will be focused on in this group so
13 you don't have to keep restating, "Here's how Wisconsin
14 Electric Power conducts its business," and you found the issue
15 like affirmative defenses of the employer's at fault, and you
16 can consolidate all those types of issues for briefing
17 purposes, only have to state them one time about this is
18 what -- this is why the electric -- Wisconsin Electric should
19 be blamed for these exposures, not somebody else.  That would
20 just be stated one time, and we can do discovery on these
21 sites in this group.
22            MR. SETTER:  I guess what I'm confused about is
23 there's one thing in terms of practical application of doing
24 the depositions of site workers for plaintiffs, and then the
25 other issue is the utility in terms of doing the -- from a

Colloquy                                                      90

1  briefing standpoint for summary judgment.  I guess that's what
2  you're trying to -- I'm not really clear what this change --
3        MR. McCOY:  I think that the utility should be for
4  both, and that's what -- what it is, but at the end of the day
5  what -- we can organize it well, and I, as I said, that we're
6  qualitatively organized, then the time you need to write
7  briefs and read briefs and write opinions, as well as the time
8  needed to actually get the evidence on record, is all
9  dramatically reduced.  That's why I said they used 30 percent
10 of the effort.
11       MR. SETTER:  So these go maybe in flights or
12 substations from the current scheduling orders or some way
13 or --
14       THE COURT:  I don't know.
15       MR. McCOY:  The --
16       THE COURT:  What do you say, flights?
17       MR. SETTER:  Yeah.  Different flights, we're now
18 taking off from different flights.
19       MR. McCOY:  Yes.
20       THE COURT:  I'm not quite sure I --
21       MR. SETTER:  We're on group two, flight one.
22       MR. McCOY:  It's like sub-groups A, B --
23       THE COURT:  Yeah.
24       MR. McCOY:  A, B, C.  It's the same thing, yeah,
25 it's --

Colloquy                                                      91

1        THE COURT:  I like that flights, though, that's
2  good.
3        MR. LAUTH:  As long as "fancy" is not included in
4  the same sentence, that's fine.
5        THE COURT:  You can't use "fancy" and "flight"
6  together?
7        MR. LAUTH:  No, "flight of fancy."
8        MR. FONSTAD:  I'm still a bit confused.  These are
9  still individual cases --
10       THE COURT:  Yes.
11       MR. FONSTAD:  -- that have to be treated as an
12 individual basis.  So -- so if -- if Oak Creek, and I'm -- I'm
13 assuming this is accurate, I don't know if it's 100 percent,
14 but if Mr. Anhnert was an electrician there and someone else
15 working on turbine there --
16       MR. CASCINO:  He was a steamfitter.
17       MR. FONSTAD:  I'm sorry.  Thanks, Mike.
18       But regardless, different people have different jobs
19 and worked at the jobsites at different times.  They worked
20 there under the direction of different subcontractors or -- so
21 I'm not quite seeing that there are great efficiencies,
22 because we need to build the record in an -- in an individual
23 case.
24       So if a witness is only being put up in the Anhnert
25 case, for example, we need to ask our questions, you know, to

Colloquy                                                      92

1  establish, you know, control, et cetera, in that context of
2  that case because we can't use a deposition taken in a
3  different case to prove something in Anhnert.
4        So we need to establish our record in an individual
5  case, and we need to deal with the causation and what is up
6  with that plaintiff that -- so I understand generally that
7  there might be efficiencies to talking about the same jobsite
8  multiple times so we all, you know, can insert the same
9  general single paragraph in our briefs saying this is the Oak
10 Creek Powerhouse, but I think --
11       THE COURT:  Well, let's -- let's break --
12       MR. FONSTAD:  -- we can add some --
13       THE COURT:  Let's break this out, because I,
14 frankly, think this might -- if this has utility, it might
15 have more utility with respect to the discovery process and
16 the deposition process than the summary judgment process,
17 which will kind of evolve on its own.  But I'm just looking
18 at, and I don't see this so much with respect to the -- to the
19 group one, but if you look at group two, there's Illinois
20 Industrial.
21       I mean you could -- if you -- this might -- this
22 goes to a topic that we talked about earlier about the elderly
23 site workers' depositions.  If you go to -- like I'm looking,
24 for example, just sticks out at me like the -- if you look at
25 the elderly site witness -- site workers, one, two, three,

Colloquy                                                      93

1  four -- the fifth column down, I see Robert Elrod there in
2  that box.  I see Robert Elrod appearing below in Joliet
3  Generating Station.  So there's Mr. Elrod, who -- and I'm
4  going to -- you know, I accept -- I guess this is what -- this
5  is the kind of thing we were asking the plaintiffs to do.
6        Mr. Elrod presumably would be a witness to establish
7  causation with respect to the five witnesses at the Dresden
8  Power Plant, who are all individual plaintiffs, two of whom
9  are also alleged exposure at the Joliet Generating Station,
10 and when you take -- you would notice Mr. Elrod's deposition
11 and you would ask him about those five particular plaintiffs,
12 and you've got over here in this next column all the various
13 potential defendants who would then be the subject of the
14 notice and would appear and would ask their questions of that
15 witness with respect to those plaintiff [sic], with respect to
16 these products.
17       I mean it combines the three other things that we
18 were trying to triangulate with in order to -- that looks to
19 me, I'm not sure that's what you intended, but it looks to me
20 like that could really enhance efficiency and solve some of
21 the other problems that we were earlier discussing.
22       MR. FONSTAD:  I think that -- and primary, there's
23 one assumption and that's that Mr. Elrod actually could talk
24 about -- was a co-worker of all five plaintiffs, who could
25 identified products made by (inaudible), GE, you know,

**Colloquy** 94

1  every --

2       THE COURT:  That would require more refinement.

3       MR. FONSTAD:  Yes.

4       UNIDENTIFIED ATTORNEY:  Yes.

5       MR. FONSTAD:  So, and -- but I think that that

6  then --

7       THE COURT:  This is a lot more refinement than you

8  had -- than Ms. Studebaker had when she received 817 pages

9  with 20 -- 20 names or more on each page.

10      MR. FONSTAD:  No, that's definitely true, but I

11 don't -- I think that the more natural requirement is when a

12 dep notice is out, they list what defendants are at issue in

13 the notice, and the caption of the notice is in multiple

14 cases, and that's the typical way it's been proceeding.  So I

15 don't -- I don't -- I'm not quite sure what this is adding.

16      MR. McCOY:  I would add to what you -- what you're

17 saying.  I'm agreeing 100 percent, so -- and that is the

18 deposition notice would state -- would add to it the products

19 or the defendants to be implicated and the jobsites that the

20 guy's going to talk about.

21      MR. FONSTAD:  Okay.  So it's -- from this is it fair

22 for me to say, yes, Mr. Elrod can talk about Dresden, but I

23 don't know if he can talk about GE.

24      MR. McCOY:  This chart doesn't tell us which --

25 which brands he can talk about, but our -- under information

**Colloquy** 95

1  we would -- we would put it in the notice.

2       MR. SETTER:  But you would also be saying he's going

3  to talk about those five plaintiffs, as well as the other

4  plaintiffs that he's listed for LaSalle Nuclear, proposed nine

5  or eight plaintiff -- I mean the point is if you tie in --

6       THE COURT:  Yeah.

7       MR. SETTER:  -- the plaintiffs with the products and

8  the jobsites -- well, they're kind of doing that now, anyhow,

9  but we -- we haven't really --

10      THE COURT:  Are you doing that now?

11      MR. FONSTAD:  That's what we're doing now, Your

12 Honor, and what we're trying to get -- I mean back to what I

13 said the last time, I just need to know who they're going to

14 use at trial.

15      THE COURT:  Yeah.

16      MR. FONSTAD:  Who are they going to use in response

17 to my motion for summary judgment?  Not 800; eight or five or

18 whatever.  These guys, pick your guys in the elderly site

19 workers column that you think are going to offer testimony

20 about my client.  Those are the ones I want to depose.  I'm

21 glad they're -- they're further refining their search.  I'm

22 not sure that it requires changing scheduling orders.  They

23 just need to keep concentrating and keep refining who they're

24 going to use.  We want to take the depos of the people they're

25 going to use.

**Colloquy** 96

1       I don't want to get the guy like Frankenberger who

2  pops an affidavit on me on a product I've never seen before.

3       THE COURT:  That's your second time in making that

4  particular point.  That should be enough.

5       MR. FONSTAD:  Great.

6       THE COURT:  I got it.  I got it, and I completely

7  agree with you.

8       MR. FONSTAD:  Okay.

9       THE COURT:  I completely agree with you, and I -- I

10 think, you know, more importantly, Judge Robreno might very

11 well agree with you, but we'll see, and that has its

12 implications.

13      So -- so you're saying -- so they're saying, at

14 least with respect to discovery, and I guess this goes back to

15 you, Bob, when you are noticing depositions of these co-

16 workers, site workers, co-workers, whatever, you've been doing

17 that for the last, you know, six, eight months or so or more,

18 right?  You're doing that with respect to particular

19 plaintiffs, obviously, and you -- sometimes there are multiple

20 plaintiffs, and you're also identifying the defendants who

21 are -- that witness is going to be --

22      MR. McCOY:  Right.  What we haven't been providing,

23 except, I think, in the Jack Wetzler case we did, with which

24 jobsites that they're going to cover.  That would be an

25 additional point --

**Colloquy** 97

1       THE COURT:  All right.

2       MR. McCOY:  -- to make this -- to consolidate all

3  this --

4       THE COURT:  Well, I'm sure if they're not going to

5  object to that, it's not going to hurt, but I'm not -- okay.

6       So -- so what's -- so explain to me again with

7  respect to the impact upon the summary judgment scheduling

8  orders.  I guess I'm hearing you say you -- do you believe,

9  for example, that what this would do would be, say, whatever

10 the date is for CVLO group one in the Milwaukee area, that

11 would mean that you would focus upon the depositions of

12 your -- of your site workers and -- your plain -- those

13 plaintiffs, obviously, who may still be living and site

14 workers.

15      You would emphasize your discovery with respect to

16 that, and then following upon that, the motion for summary

17 judgment with respect to that, and presumably none of the

18 people who are -- who are witnesses -- elderly site workers

19 aren't characterized as witnesses, possibly causation

20 witnesses is maybe the way they're being treated here now for

21 this plaintiffs [sic] -- none of them are going to appear in

22 CVL -- in your group Roman numeral two, your group Roman

23 numeral three, your group Roman numeral four, presumably, so

24 that the defendants don't have to worry about those witnesses

25 with respect to any information outside what is in your CVLO

Colloquy                98

1  group one, and then you're done with those witnesses.  Those
2  summary judgments proceed, and I -- I guess I could see how
3  that could be more efficient.
4          What do you think, Danny?  Don't give me your knee
5  jerk reaction.  Give me your real -- reflect that I'm talking
6  about.
7          MR. MULHOLLAND:  My real reflect in following that
8  is you -- is you follow the procedure that's presently in
9  place and do it right, then we're fine.
10         THE COURT:  That's your reflective responsive, or is
11 that your --
12         MR. MULHOLLAND:  I've been listening to everything
13 that's been said, and that is my reflective response.
14         I don't see -- clearly, they -- they could be more
15 efficient, so let them knock themselves out and be more
16 efficient.  Nothing's -- nobody's holding them back.
17         MR. SETTER:  I would just comment on this.  Then you
18 can get multiple summary judgments on the same person,
19 presumably --
20         THE COURT:  What do you mean?
21         MR. SETTER:  Because of the way it's being phased
22 in.  If you're -- if you're staggering summary judgments based
23 on jobsite and we do Mr. Harold Aftler summary judgment for
24 Allis-Chalmers, and then he shows back up, you know, three
25 weeks down, I don't know if they're altering the dates in

Colloquy                99

1  terms of motion dates or -- or what.  I mean are we -- are we
2  accelerating dates?  In other words, if we have October 29th
3  for one group, we can say, okay, now we got five site I.D.
4  things, we're going to have to get summary judgments done
5  before October 29th, maybe --
6          THE COURT:  I don't know.  We have a --
7          MR. McCOY:  There's only one -- only one --
8          MR. SETTER:  I don't see the efficiency there.
9          MR. McCOY:  There's only one summary judgment
10 briefing date deadline, brief, you know, so each plaintiff --
11 yeah, each plaintiff falls in -- in the one group, and that's
12 where all the summary judgment briefing occurs.
13         If there are -- if there are some jobsites, and
14 there are some things that may have jobsites in another brief,
15 then those would have to be disposed of as part of the
16 first -- as part of the ones you've -- that they're assigned
17 to; however, what we're saying is that the qualitative
18 perspective, the primary evidence for this plaintiff falls
19 within this group, and you're probably not going to have too
20 much coming from someplace else when you deal with this
21 particular claim.
22         So I mean the situation now is that it's a free-for-
23 all as to where -- as to where that evidence is coming from.
24 Now we're making it so it's predominantly organized by GE.
25              (Transcriber change)

Colloquy               100

1          THE COURT:  Well, is it a free-for-all?  Or does it
2  really rather follow upon those cases that you're -- you --
3  you know, you have it within your power to -- to do the
4  discovery on those cases that are in the group that you want
5  emphasized.  I mean, isn't that the way most of the discovery
6  has gone?
7          MR. McCOY:  Well --
8          THE COURT:  I mean, who knows in the depositions of
9  the site workers?
10         MR. McCOY:  Yeah.  I mean, we are -- we are noticing
11 most of the site worker depositions, but -- but we can -- you
12 know, we can notice one deposition for one plaintiff's case
13 and get that done.  And we have to worry about use of that and
14 all the other cases that have objections to it on protocol and
15 so on.
16         THE COURT:  Yes, but you can -- but you can deal
17 with that under the current protocol.  I mean, I -- I guess
18 I'm --
19         MR. McCOY:  No, I mean what -- what Your Honor said
20 before about consolidating discovery, at least they're all --
21 they're all tied together, if we deal with this based on what
22 your witnesses know about job sites.  And, if they know a
23 plaintiff, obviously we would say they also know this one
24 plaintiff, and I'll talk about this one plaintiff.  And, all
25 that plaintiff's discovery has to be done for them to talk

Colloquy               101

1  about it.
2          THE COURT:  All right.  I'll tell you what I -- I'll
3  tell you what I'd like to do here.
4          MR. McCOY:  Yeah.
5          THE COURT:  I'm not prepared to -- to direct or be
6  any change on this, at least as of now.  But I am -- I'm happy
7  for you to flush this out a little bit more in terms of what
8  it would look like with respect to impact upon particular
9  scheduling orders.  I guess as I learn a little bit more about
10 what you have been doing and what options you've been
11 exercising, and what seems to -- what I'm hearing, at least
12 from what Mr. Mulholland and Mr. Setter suggest, seems to be
13 working.
14         You're really not precluded from kind of doing what
15 you're doing now.  But I -- what I would ask is that -- Mr. --
16 Mr. McCoy with -- maybe perhaps with Ms. Studebaker looking at
17 this, to get together and try to talk through some of this.
18 And, I would not be -- I would not object if Mr. Harris is
19 going to continue to play some role.  And, the inference I
20 draw from him whispering in your right ear from time to time
21 on this particular subject suggests to me that maybe he's
22 giving you some input on this.  And, I have no objection, if
23 nobody else does, in having Ms. Studebaker consult Mr. Harris
24 about this if you're too busy to do it, and try to see if it
25 really is going to make a difference.

Colloquy                                                                102

1    I mean, it -- it appeals to me at one level.  Maybe
2  because I'm seeing a little more organization than what I've
3  seen before.  But I -- I hear what the defendants are saying,
4  but they're not quite sure it really represents a significant
5  change.  And, the -- you know, the -- the fallback position is
6  going to be, we're not going to mess with the scheduling
7  order.  They were set up.  They've been in place for -- you
8  know, at least since April and earlier.  I'm not going to mess
9  with the scheduling orders unless we can be convinced that
10  there's a -- you know, a real legitimate reason to make a
11  change.  And, I'm hearing enough now that says to me there
12  might be some question about that.
13        So -- but, you know, there's a start.  And, so let's
14  make this something that -- I don't know if you'll get a
15  chance to have any conversation between now and next
16  Wednesday.  We'll have this being an agenda item on our
17  Wednesday call next week and maybe the following week, and
18  then we'll see whether or not anything further can be done.
19  That's as far as -- I can't take it any further than that.
20  But you know my general proposition.  It's if you're going to
21  do something that's going to push back the ultimate deadlines,
22  if you're going to do something that's going to cause a whole
23  lot more motions for summary judgment becoming right at one
24  time, as opposed to them being relatively staggered, we're not
25  going to be very responsive to it.

Colloquy                                                                103

1    So you got to have it spread like we've had it.
2  And, I think I have heard you suggest you still have a spread
3  when the motions become fully ripe.  And, I think if you moved
4  it back a little bit, I'm not going to get too upset.  But not
5  -- no substantial move back or -- this is -- this is not --
6  I'm not going to see this as the Trojan horse that's going to
7  try to get you some more time on discovery.  It's not likely
8  to happen from my perspective.  Maybe a little bit.  But
9  that's kind of what my general views are about.
10        MR. MCCOY:  How are you if we close off discovery
11  (inaudible) within 30 days and then the briefing start as
12  quick as possible after that?
13        THE COURT:  Yes.  All right.  Well, that might --
14        MR. MCCOY:  I mean --
15        THE COURT:  -- that might work.  And, that might not
16  be too disruptive.  Because that -- that's probably going to
17  accelerate discovery on a number of these matters.  But then
18  when you do that, what do you do with respect to the -- to the
19  expert?  You know, what do you do with respect to your -- I
20  mean, it's -- that's -- it all impacts you.  And, you guys
21  got to work through that if you're going to make that change.
22        So I'm kind of disinclined because I just think
23  there's unintended consequences.  Some of which have been
24  discussed here, and some of which being truly unintended and
25  maybe not expected, haven't even really been articulated, it

Colloquy                                                                104

1  seems to me.  But I don't know.  But I -- I'm grateful that
2  you've -- you know, I think that -- I think that there could
3  be something here.  That's all -- I'll give you that.  And --
4  but, you know, whether it's already in place or not --
5  defendants say it is.  All right.  Maybe a lot of it is.  So,
6  anyway, that's -- I like to try to give you some definitive
7  inclinations on it, and this one is -- you got a, you know,
8  fairly substantial inclination that you've got to show me a
9  little bit more in terms of the impact upon the regulars here.
10        I think your next item, which is the business about
11  the conferences after summary judgment rulings on these cases.
12  I'm not -- I'm really not quire sure what you mean about that
13  and what it is that we're supposed to do.  I mean, if there's
14  a ruling, there's a ruling.  The Judge enters a ruling,
15  lawyers go figure out what they think it all means.  And, I'm
16  not so sure what -- what is it we're supposed to do?
17        MR. CASCINO:  Your Honor --
18        THE COURT:  Mr. Cascino, is this your -- is this
19  your item?
20        MR. CASCINO:  I guess so.  I -- I don't know where
21  this actually -- where this would -- I'm not sure where it
22  came from, but --
23        THE COURT:  If nobody wants to claim it, why don't
24  we just --
25        MR. CASCINO:  But -- but I think -- I think --

Colloquy                                                                105

1        THE COURT:  Maybe Mr. Vaughan snuck it in there.
2        UNIDENTIFIED COUNSEL:  It wasn't specifically -- it
3  wasn't specifically listed as an item in our agenda, but it --
4        THE COURT:  Oh.
5        UNIDENTIFIED COUNSEL:  -- it came evidently from
6  our --
7        THE COURT:  It was in one of your letters.
8        UNIDENTIFIED COUNSEL:  Okay.  So -- so --
9        THE COURT:  You can blame it on --
10        UNIDENTIFIED COUNSEL:  I'm looking -- I'm looking at
11  it.
12        UNIDENTIFIED COUNSEL:  What the issue --
13        UNIDENTIFIED COUNSEL:  I might as well.
14        MR. CASCINO:  What -- what the issue is, is this.
15  After the case -- after the case is finished with summary
16  judgment, the rule -- they are immediately sent back to the --
17  to the original district.  What we would propose is -- and
18  what Judge Robreno previously had in some of his scheduling
19  orders is there would be a settlement conference.
20        THE COURT:  Yes.  I think that was in some of mine,
21  too.  Look, let me tell you how we're going to do that.  And,
22  I -- and I can't -- I think some of my -- I don't remember, to
23  be honest, whether my scheduling orders say anything about
24  conferences after that.  I think what they say is that at any
25  time anybody thinks it's productive, and particularly both

Colloquy                                                106

1  parties agree for conferences, we'll make ourselves available.
2  You know, if not me personally, the other Magistrate Judges
3  who have been working on these cases, we'll find a Magistrate
4  Judge to give you time within a reasonable period of time
5  after the dispositive motion.
6          But what we're going to do is going to require you
7  to ask for them in a particular case.  And, there has to be an
8  indication between the plaintiffs and the defendants that both
9  parties think it's reasonable to have a settlement conference.
10 What -- what we're not going to do, and I know you don't want
11 to do, is waste our time driving people in here when -- you
12 know, from your perspective, Mike, if the defendants don't
13 want to pay full value and the cases from your perspective
14 were what you could get out of it, you know, it doesn't --
15 doesn't work.
16         I'd like to think -- you know, and what -- what
17 concerns me is that, you know, the hammer you have of a trial
18 date is obviously the most effective thing towards getting
19 cases settled.  The hammer of a remand date is a bit
20 amorphous.  You know, because I don't know, frankly, we've
21 gotten commitments from the Courts generally that they're
22 prepared to get these cases tried reasonably quickly.
23         I don't know what you're actually finding or what
24 you guys expect.  You know more about local procedures, but
25 we've been led to believe through the Judicial Conference that

Colloquy                                                107

1  there will be Judges made available to get these cases tried
2  promptly after remand.  I'm not quite sure how they're going
3  to do that in Central Illinois where they only have one Judge
4  and two retired Judges but they're going to pluck -- they're
5  going to pluck a senior Judge from someplace and let him spend
6  a summer in Chicago.
7          MR. CASCINO:  Fair enough.
8          THE COURT:  Maybe.
9          MR. CASCINO:  So far -- and that brings up an issue.
10 There have been two cases that have been remanded.  One has a
11 trial date in October.  The other one there's been at least a
12 telephone conference on.  There's a scheduled conference
13 coming up on that case.  On that case the defendants are
14 claiming that they're not -- they're not ready for trial.  So
15 we have to start the process all over again.  And --
16         THE COURT:  And, what have you said to the Trial
17 Judge?
18         MR. MCCOY:  I was on that call.  And, Mike is
19 summarizing fairly accurately.
20         THE COURT:  Which case is that?
21         MR. MCCOY:  It was the perception I -- I had.  They
22 decided not -- not --
23         THE COURT:  Which -- which case is it, Bob?
24         MR. MCCOY:  It's the Bushmaker case.
25 And --

Colloquy                                                108

1          THE COURT:  Who's on it?  Anybody over here on it?
2          MR. MCCOY:  Rapid American and Chesterton both had
3  counsel on the phone.
4          THE COURT:  Okay.  Anybody from Rapid American or
5  Chesterton here?
6          MR. CINSILLA:  I'm here from Chesterton.  Your
7  Honor, I was not on that call.
8          THE COURT:  Do you know what he's talking about?
9          MR. CINSILLA:  I know that there was a scheduling
10 call.  I know that they talked about an appropriate trial
11 date.
12         THE COURT:  All right.  What -- what's your name,
13 sir?
14         MR. CINSILLA:  Jason Cinsilla, Your Honor.
15         THE COURT:  Jason Cinsilla, can you leave your card
16 for our ESR reporter here now, so we can get your last name
17 spelled properly?
18         MR. CINSILLA:  I did put my name on the sign-in
19 sheet.
20         THE COURT:  Okay.  Good.
21         MR. MCCOY:  But it's during that call -- it wasn't
22 of record, but there's an order issued reflecting the -- that
23 we made things of record, and there's a due date of July 20th
24 for the submission of the parties, and another hearing on July
25 25.  But having said that, Judge, that the tone of the

Colloquy                                                109

1  conference was essentially that's -- from a defense, and said
2  that discovery was to be continued needs to be continued, and
3  that Daubert hearings need to be held on experts.  And, that
4  these issues haven't been resolved through the MDL --
5          THE COURT:  Have not been resolved?
6          MR. MCCOY:  Have not been resolved.  And there's
7  other things that need to be decided.  And, I -- my comment to
8  the Magistrate Judge who -- Magistrate Judge Crocker there had
9  gotten -- got the case by agreement was that maybe on July 13
10 here there could be some clarification shed on that.  I didn't
11 guarantee them anything, but I just said maybe.  And, I said
12 that's why we submitted these papers.
13         If (inaudible) wants I can wait until July 20th to
14 submit to a Judge.  But that was essentially what happened in
15 that conference.  It went on for quite awhile.  Maybe 45
16 minutes to an hour, basically talking about the same kinds
17 things you hear about whether it can be resolved or not
18 resolved, or how is it going to be resolved.
19         THE COURT:  Well, I -- look, I --
20         MR. MCCOY:  That -- that was why we had an item
21 about the need for clarity -- clarity and consistency for
22 remand that was on our --
23         THE COURT:  All right.  I mean, I -- I'm happy to
24 tell you what I know.  And, it's not -- not that much.  It's
25 relatively minimal.  And -- and what I understand -- and what

Colloquy 110

1  I understand is -- and as I think we've told you consistently,
2  is that these cases are supposed to be trial ready when
3  they're sent back to the transfer of Courts.  That's the way
4  -- I don't know all MDL's, but the first -- this is the first
5  MDL I've worked on in a significant way.  But I don't know if
6  all MDL's are like that, but that's the way this one is
7  supposed to be set up.  It's supposed to be trial ready.
8  Consolidation of discovery, do the discovery more efficiently,
9  et cetera, et cetera, et cetera.
10      And, I would have thought there's some order
11  someplace that says that but I don't know.  I don't know what
12  you can tell Judge Crocker, but that's -- that's my
13  understanding of it.  And, the place where we've now drawn a
14  line, as you know, is if we're going to resolve dispositive
15  motions, and we're going to resolve *limines* only if they have
16  a case preclusive of fact, and they're articulated as motions
17  for summary judgment.  But we've issued kind of a blanket
18  order saying we don't want any -- any sort of trial context
19  *limine* motions.  We don't want -- that's going to be for the
20  transfer Judge to sort of manage the trial and deal with those
21  kinds of questions.  But that's my understanding, so I can't
22  -- I can't comment.  Mike, you're going to pop up.  Like, I
23  can hear --
24      MR. CASCINO:  Your Honor, I'm so used to it.  Can
25  that be part of the orders in the future, trial ready?

Colloquy 111

1      THE COURT:  That's a Judge Robreno question.  It's
2  beyond my pay grade.
3      MR. CASCINO:  Can you bring that to Judge
4  Robreno's --
5      THE COURT:  Sure.
6      MR. CASCINO:  -- attention?
7      THE COURT:  Sure.  It's my understanding what's
8  supposed to happen but, you know, I don't tell Judge Crocker
9  what to do, and he doesn't tell me what to do.  So I'm just
10  giving you the way I understand it.  But it's -- you know, I
11  hear you.  I'll be glad to discuss it with Judge Robreno.  But
12  Judge Robreno's consistently, I think, told all of us -- you
13  guys have been in sessions with him.  We're going to try to
14  resolve as many of these cases as we possibly can.
15      We'll even hold them after summary judgment for
16  settlement if we think it's productive.  Or you can go back to
17  your transfer Courts and do settlement back there.  It might
18  be easier if we can do it there.  Happy to get rid of you
19  guys.  It's fun for a long time, but it's getting a little
20  old.  So that's -- that's my answer.
21      MR. LAUTH:  Your Honor, Richard Lauth.  I can take
22  one more issue off the agenda right now, if you'd like.  It's
23  exactly on point.  That's remand issues, Section C, technical
24  issues related to post-remand service.  My understanding was
25  that Judge Robreno wanted to know where issues -- technical

Colloquy 112

1  issues came up about what happened in this other case that Mr.
2  Patina is talking about is the Deon Wright case.  When it got
3  remanded back to -- I guess -- is it Central or Northern
4  District --
5      UNIDENTIFIED COUNSEL:  Northern.
6      MR. LAUTH:  -- of Chicago?  Northern.  We got set
7  for a hearing with the Court, and I've made my appearance
8  here.  My appearance in the case when it was in MDL 875 didn't
9  make it back to the transfer to our court.  And, so whoever
10  was served was somebody that is no longer affiliated --
11  apparently no longer affiliated.  We never got notice of the
12  hearing.  And, some of these cases are decades old, as we all
13  know.  And, I don't even -- I've worked on my client's
14  business for more than a decade and I don't even recognize
15  some of the lawyers who still got stuck on the transfer
16  report's service list.
17      So is there a way we can work that system?  I don't
18  know if it's an electronic or technical thing, but perhaps the
19  service list could make its way back down to the transfer for
20  our court as well.  Because I didn't even get notice of it and
21  the case got set for trial without me being there.  So --
22      THE COURT:  What happened?
23      MR. LAUTH:  What's that?
24      THE COURT:  What happened?
25      MR. LAUTH:  It got set -- well, it got set for trial

Colloquy 113

1  without me being there, and I learned about it after the fact
2  from somebody who was there.
3      THE COURT:  So -- but it didn't get tried?
4      MR. LAUTH:  No.  You know what I mean, I'm just --
5  I'd like to be there when the status conferences happen.
6      THE COURT:  I don't know the answer to your
7  question.  Could there be a process?  I'm sure there could be
8  a process.  It's probably the kind of thing you should take up
9  with Mike Kunz, our clerk here.
10      UNIDENTIFIED COUNSEL:  Mary Chase.  Mary Chase.
11      THE COURT:  Yes, Mary Chase, right.
12      MR. LAUTH:  Yeah, that's -- that's the reason I'm
13  not complaining to you for a remedy.  I'm just bringing it to
14  your attention, so you know that this is potentially
15  happening.  Because I don't want to --
16      THE COURT:  Yes.  We will -- we will bring it to the
17  attention of the appropriate people, and we'll raise it with
18  Judge Robreno in our next session with him.  And, just prompt
19  us not -- prompt us, say, next Wednesday.  Not this Wednesday.
20  You know, the next -- not -- give us about 10 days to -- to
21  look at that.  But, you know, it seems to me, you do get
22  notice of a remand.  I mean, it seems to me your failsafe is
23  you're remanded back to that particular Court.  You ought to
24  check the Docket back in that particular Court and make sure
25  you're on it.  If you're not, get on it.  I mean, that's

Colloquy                                                      114

1 another way to deal with it.

2         MR. LAUTH:  It all happened quickly.  I agree, there

3 are ways -- and we have now procedures in place to account for

4 that, but I just want to make sure that everybody else in the

5 room who gets a case remanded is aware that this may be an

6 issue.

7         THE COURT:  That's -- he's a very good liaison

8 counsel for that reason, all you guys sitting out there.

9         MR. LAUTH:  You're on notice.

10        MR. CASCINO:  The Court should be aware that A.W.

11 Chesterton at that hearing said the case was not trial ready

12 and they had to do all this other stuff.

13        THE COURT:  Well, that's what we just heard.  Now, I

14 don't -- I don't know.  Maybe that guy didn't talk to the --

15 the A.W. Chesterton lawyers who were involved in the MDL.  I

16 don't know.

17        MR. CINSILLA:  Yeah, I don't know the specifics,

18 Your Honor.  I believe the issue was we wanted an opportunity

19 to take a followup medical deposition of the plaintiff.

20        UNIDENTIFIED COUNSEL:  That was not at all said at

21 the hearing.

22        UNIDENTIFIED COUNSEL:  I'm sorry?

23        UNIDENTIFIED COUNSEL:  That was not said.

24        THE COURT:  All right.  All right.  That's -- that's

25 not really for this conference.  All right.

---

Colloquy                                                      115

1         MR. MCCOY:  I think -- Judge, I -- I have a couple

2 more comments on 2-B.

3         THE COURT:  Yes.

4         MR. MCCOY:  Because --

5         THE COURT:  And, 2-C, let's combine them together.

6         MR. MCCOY:  Right.  Well, what I saw in 2-B in the

7 most recent round of subgroup E files.  And, subgroup A files.

8 There's just so much redundancy review arguments that have

9 already been resolved one time by Judge Robreno.  And, it

10 would be very helpful, I would think, to have some sort of --

11 of a reference point for the index or whatever from those

12 rulings, we can all refer back to those if we have to restate

13 all of our arguments on those points.

14        I mean, that's a real -- there's just so much to

15 that paperwork that's been stated over and over on proximate

16 cause wisdom or statute imposed issues that have been

17 resolved.  And, that -- that, I think, is -- that -- that will

18 only continue (inaudible) at least some reference for

19 everybody to be able to say, hey, I'm going to adopt the

20 arguments that we made and this ruling and --

21        THE COURT:  Well, don't you just -- when you -- when

22 you file your papers, don't you just refer to the decisions

23 that were rendered that were favorable to your position and

24 just --

25        MR. MCCOY:  We -- we do.

---

Colloquy                                                      116

1         THE COURT:  Well, then they do.  I mean, isn't --

2         MR. MCCOY:  But -- but is that sometimes people

3 don't remember?  I mean, it's just -- it just isn't -- it just

4 seems to me as though -- as though everybody should be working

5 off the same page.

6         THE COURT:  Let's move on to our next issue.

7         MR. MCCOY:  All right.  I say that -- I say -- I

8 don't want to say anymore, but I -- I think that's the -- 2B

9 is what I --

10        THE COURT:  Well, I -- I don't see any verbiage

11 whatsoever for -- for the Court to be involved in having some

12 kind of conference to discuss what kind of issues have been

13 resolved.  The issues that have been resolved have been

14 resolved.  If they apply to other cases, that's for the

15 lawyers to argue about.  That's what the lawyers are for.

16 We're supposed to deal with specific issues that have been

17 beat up to come to us on a particularized basis, not to hold

18 conferences to tell people to supply to that and that and the

19 other thing.  It needs to -- an individualized sort of cases,

20 at least in my judgment.

21        So -- and I think similarly, with respect to semi-

22 monthly discovery conferences that have been talked about

23 here, I mean, I -- you know, a conference like this, I think

24 you've demonstrated to me, which is -- I think, has been a

25 useful exercise.  And, you've gotten for me maybe some quotes

---

Colloquy                                                      117

1 or guidance about certain things.  You've gotten some hard

2 rulings on some things previously.  And, you will get some

3 more hard rulings relatively soon.  I think some of the

4 discussion that we've had has helped me in terms of -- in

5 terms of some of our -- some of the rulings on -- on motions

6 that -- that are fully briefed and we might be able to get out

7 a little more quickly than we would otherwise.

8         So that's been very -- that's been very helpful.

9 But I'm not -- you know, we'll hold -- we'll hold conferences

10 and settlement conferences when both lawyers want -- think

11 that's useful.  But discovery conference is on a case-by-case

12 basis.  And, I can't really say much more than that.  I'm not

13 going to set up something where we do them every two weeks.

14 What's this business about deferring certain expert

15 depositions?  Whose issue is that, and what's the question,

16 given where -- given where we've dealt with in the scheduling

17 order.  I think the scheduling orders have time in there for

18 expert discovery, as I recall.  Half the reports are filed.

19 So what's --

20        MR. MCCOY:  They just came from (inaudible).

21        MR. LAUTH:  Your Honor, this is something that Mr.

22 Casmere brought up and -- and me, to a certain extent.  The

23 thought behind it is, for example, there are certain experts

24 who may be used at the time of trial like the client's

25 treating physician.  And, I think Mr. Casmere had asked for a

Colloquy                                                                118

1  particular treating physician's depositions in the context of
2  one of the specific cases.  It's -- expert deadlines have
3  recently -- or excuse me, discovery deadlines have recently
4  closed out.
5          And, one of the thoughts that we -- had to try
6  and help the process get along, given that we have so much to
7  do, is to perhaps postpone -- I don't know how to say this
8  without stepping in it.  I'm about to step in it though.  The
9  non-critical expert, it's not relevant to a dispositive
10 motion.  So, for example, if I'm going to try the Deon Wright
11 case, you know, and we anticipate plaintiff putting up their
12 treating physician, you know, only the people that are
13 involved in the trial of the case really care what the treater
14 has to say.
15         THE COURT:  Yes.
16         MR. LAUTH:  And, those are the types of
17 depositions -- I was wondering if there might be a way we
18 could get an agreement or a stipulation -- I don't know that
19 it has to necessarily be addressed in your order.  I don't
20 know that it materially impacts the post-remand status of the
21 case, because, you know, frankly, the Judge that gets the case
22 on the transfer Court is probably going to have to take a
23 month or two to get it actually worked into a calendar.
24         THE COURT:  Yes.
25         MR. LAUTH:  Perhaps there may be a -- a stipulation

Colloquy                                                                119

1  that could be reached there for -- for experts that are not
2  going to be the subject of a dispositive motion that -- well,
3  both parties agree.  Because, you know, plaintiffs are at this
4  point actually not taking very many defendants' experts
5  depositions right now.  I suppose it -- as much as anything
6  because they figure they know what they're going to say, and
7  they're going to say cost or shoot from the hip at the time of
8  trial.  Maybe that's an agreement that we can all get in to
9  stipulation that if you're in the case post-remand, and that's
10 the time between remand and the trial set, the trial setting
11 maybe we can work to make our own experts available one more
12 time.
13         THE COURT:  What do you think about that, Bob?
14         MR. MCCOY:  I just think that that's -- that's an
15 issue that would be part of the discussions that we're having
16 about consolidating (inaudible) cases, simplify and
17 streamline.  And, I'm -- I'm not saying that there's anything
18 wrong with that, I wanted to have it worked out, the overall
19 context of things.
20         MR. WATSON:  Your Honor, if I may.  Brian Watson on
21 behalf of Owens-Illinois.  If I could provide some
22 particularized detail on what's at issue here, is in the
23 O'Keefe case, for example, plaintiffs disclosed two treating
24 physicians who will purportedly provide medical causation and
25 disclose them as non-retained experts.  Owens Illinois noticed

Colloquy                                                                120

1  the depositions of those two witnesses.
2          At Mr. McCoy's request for those depositions were
3  delayed.  And, then delayed again.  And, we fell outside of
4  the expert discovery period.  Recognizing our brother in the
5  medical field have very limited schedules, and the rules
6  obviously provide for medical physicians to be treated very
7  different in terms of retained experts.  What we saw as an
8  opportunity was for a trial defendant, who is really going to
9  be challenging the case post-remand, to evaluate the medical
10 causation opinions of that treating physician, which will not
11 necessarily arise under all context in discovery for all
12 defendants.
13         THE COURT:  Yes, I -- I'm not -- frankly, I'm not
14 sure I understand your comment.  I'm trying delve back into
15 the other question.  Because under whatever scheduling order,
16 even if we change them, that's going to be a period of time
17 for expert depositions.  That's -- that's clear.  And, I --
18 and I -- I, frankly, think that the suggestion that you
19 gentlemen have made makes sense to me.
20         And, I would think it would be something that the
21 plaintiffs would also want.  It extracts -- it extracts an
22 element of something that may not be necessary if it's the
23 kind of case that's gotten to that point, and it's got, you
24 know, enough merit to defeat summary judgment, you have good
25 medical evidence, maybe there's a greater likelihood the case

Colloquy                                                                121

1  is going to get resolved.
2          And, I would agree with Mr. Lauth, there is
3  certainly going to be some time period between the time when
4  you get back to the transfer Court.  I would -- I think that
5  it's a -- I think it's a respectable idea.  And, I think it's
6  one that if the parties worked up by way of -- by way of a
7  stipulation -- I mean, I think we have -- you know, we've
8  already put orders out there, for example, that says that
9  we're not going to resolve trial related motions in limine.  I
10 guess that could be subject to some interpretation but -- and
11 I guess that could be interpreted differently by a different
12 Judge back in the transfer court.
13         But to the extent they're guided by our rulings --
14 or at least they're -- I guess they're bound by our rulings.
15 Our rulings are the law of the case.  They're bound by those
16 rulings.  I -- I would do something like that.  I mean, if you
17 guys wanted to work up a stipulation with respect to that, I
18 would do something like that.  You might want to try to set it
19 a little bit more in terms of parameters.  But obviously the
20 -- I can see the treaters being different.  That's a good
21 example.  I can see them really being different.
22         MR. MCCOY:  We will work on the language on that.
23         THE COURT:  Mr. Cascino is trying to get your
24 attention.  No, maybe not so much.  Okay.  So -- Yes.  Good.
25 I mean, do that.  I think that makes -- I think that makes

Colloquy 122

1  sense. All right. But make -- make sure, as I'm sure you
2  guys will, that gets on our Wednesday agenda. So check in to
3  see what the progress is on that.
4      I'm -- I see it's, you know, getting 12:30ish or so.
5  I want to stay and finish this. Does anybody have any
6  objection to that? I think we're pretty close to the end of
7  this, and get you guys out of here. Although, actually the
8  next issue on the remand question with respect to Sadek
9  Schonfeld and Anderson, it does have some complications. This
10 is -- this was a position that I was convinced back in the
11 fall that we'd take the track that we did. We're down that
12 track. You're -- you're well on that track as of this point.
13     I'm not going to secondguess whether it was a good
14 idea at the time or not. But I can see that there are
15 complications to it that, frankly, I had not completely
16 thought -- thought through. And, I don't know if you guys did
17 or not, but they're now upon us. And, we are trying to do our
18 best to deal with them. So as you can see, consistent with
19 the notion as we put in our last order that was entered on
20 June 22nd or 29th, or whatever it was, that we -- we are going
21 to require that if somebody wants to join in the -- when was
22 the motion filing date, August something?
23     UNIDENTIFIED COUNSEL: Yeah, August 10th.
24     THE COURT: Anybody anticipate that they will be
25 joining in the challenge that is being mounted, as it were, by

Colloquy 123

1  -- by counsel for Georgia-Pacific and others, with respect to
2  Schonfeld, Sadek and Anderson, needs to provide notice to us
3  that they will be joining in that motion when filed if those
4  folks have motion for summary judgment that are ripe and now
5  need to be filed. And, the reason for that is because Judge
6  Robreno quite -- quite correctly, in my view, is not going to
7  look at summary judgment motions in a piecemeal fashion. It's
8  not efficient to do. And, even more so geometrically in an
9  MDL type setting. So he will not then rule upon any motions
10 for summary judgment if that notice is filed until such time
11 as that issue -- the Sadek, Anderson, Schonfeld issue, is --
12 is resolved.
13     Now, what is unclear to me, and I want to get
14 clarity with effectiveness -- I don't know if there is -- if
15 it's possible in getting clarity on this, but it is -- it was
16 my understanding, and I think that there were representations
17 made to this effect by the parties, at least I understood them
18 to be made, that -- that if the motions -- if the plaintiffs
19 -- if the defendants prevail on those motions, that that would
20 effectively result in a loss of the ability on the part of the
21 plaintiffs to establish any connecting evidence between
22 medical condition and -- and the asbestos -- establishment of
23 asbestos exposure. And, it would, you know, have an impact of
24 eliminating many, many, many cases. And, that most of those
25 cases were the cases that were non-malignancies. And, it was

Colloquy 124

1  made to be an attractive proposition.
2      And, I understanding from all the discovery that's
3  been going on, this has been very hotly fought and very hotly
4  contested. I'm now hearing that -- that maybe it's not going
5  to have the broad impact that I had initially thought. And,
6  that because the plaintiffs will and they presumably have the
7  right under the scheduling orders to provide information with
8  respect to expert designations and using treating physicians
9  and others to be able to establish a connection independent of
10 Dr. Schonfeld or Dr. Anderson. Although presumably
11 information from Dr. Sadek and Anderson and Schonfeld might be
12 part of or used by another treater or another expert, even if
13 those witnesses do not testify directly. And, that has
14 further implications.
15     So what I'm -- what I want to sort out with you all,
16 have some, frankly -- hopefully very frank discussion about is
17 what we think about where this is going, and what we think
18 about how we're going to -- to handle it with respect to the
19 -- with respect to those cases that are remaining and such
20 other connecting medical evidence. It, also, I think,
21 implicates some of the AO-12 rulings. And, I know that the
22 defendants -- or may implicate the AO-12 rulings.
23 Some of the defendants have been now more shyly asking me
24 about when they're going get resolutions of AO-12 rulings.
25 Which I shyly suggest to Judge Robreno or his -- his law

Colloquy 125

1  clerks that -- you know, where is that in the file. And, I'm
2  told it's all being done in due course, as of course that's
3  happening. So I don't know who wants to go first on this.
4      MR. MCCOY: Judge, I have some data.
5      THE COURT: You have charts for me?
6      MR. MCCOY: I have some data. We -- I have some
7  data. We promised you some -- actually I think we came up
8  with more than I thought I -- I had promised. So -- but this
9  -- this chart begins with the (inaudible). Here's some copies
10 of it for everybody. And, without having to read it all,
11 Judge, right now, I will say that what it shows -- what it
12 shows is that -- as I understand it from our office, because I
13 -- I'm not the one who's handling this data. The people who
14 are doing but I --
15     THE COURT: By the way -- by the way, that -- that
16 explanation is meaningless to me.
17     MR. MCCOY: Right. I understand.
18     THE COURT: You're here speaking for all this, so
19 you're the guy.
20     MR. MCCOY: Right. I'm just -- I'm just telling you
21 that -- don't ask me too many questions on it, but there's 203
22 clients who -- who I understand who are also a part of AO-12
23 challenges. And, that -- of that group, 67 percent have
24 mountable support from the treaters of the underlying asbestos
25 related disease. And, that's what this chart shows. So if

Colloquy                              126

1  the -- based on this chart, 65 cases are -- are at risk, with
2  one-third of the cases roughly for the rulings on the
3  Schonfeld side (inaudible).
4       MR. SETTER:  If I can comment, Your Honor?
5       THE COURT:  Just one -- yes, certainly I'm going to
6  give you every chance to comment, Mr. Setter.
7       MR. MCCOY:  This is --
8       THE COURT:  Just so -- just so I understand this,
9  the -- the big tall one at the -- on the far left, 37 percent,
10  76, that represents what?  You're saying --
11      MR. MCCOY:  The bilateral underlying --
12      THE COURT:  Speak.
13      MR. MCCOY:  -- in the treater directors.
14      THE COURT:  All right.  So that means you believe
15  there's a treating physician who would be designated by you as
16  an expert to establish that the cause of the injuries to this
17  particular plaintiff or death of this particular plaintiff is
18  the asbestos exposure?
19      MR. MCCOY:  Yes.
20      THE COURT:  Oh.
21      MR. MCCOY:  Or that our experts are relying on
22  records generated by that treating physician that say that.
23      THE COURT:  Okay.
24      MR. SETTER:  If I may, Judge, with -- with respect
25  to this issue, because I want to address the question that you

Colloquy                              127

1  had about the effect of the -- the Daubert motion and hearing.
2  But with respect to this particular issue, it's really
3  irrelevant from this standpoint.  The AO-12 motions of about
4  203 cases have been fully briefed and had been at issue since
5  the end of March, where Judge Robreno accepted our reply brief
6  on March 31st.  The AO-12 motion is on the basis what was
7  submitted pursuant to AO-12 and amended AO-12.
8       THE COURT:  Right.
9       MR. SETTER:  -- regardless if there was a treater
10  record or not.  If there were treater record, it should have
11  been part of AO-12, but they weren't.  That's kind of tough in
12  terms of the entire ruling.  And, I guess my point is that
13  this really doesn't help resolve the issue, because if the AO-
14  12 motion were granted, the case was disposed of on the basis
15  of the administrative order number 12 not being complied with,
16  as opposed to the supplementation.
17      Mr. McCoy and Mr. Cascino have had the opportunity
18  -- in fact, they explicitly requested to supplement the AO-12
19  issues with respect to some of these materials that we're
20  talking about.  And, I don't think Judge Robreno would want
21  them together, honestly.  But I don't think that --
22      THE COURT:  Your understanding is that that request
23  is still -- that's an outstanding request?
24      MR. SETTER:  I think it's part of the response
25  saying we would like --

Colloquy                              128

1       THE COURT:  Do you know why?  Do you know?
2       MR. MCCOY:  I don't -- I don't know where that
3  stands, but I -- I don't know.
4       THE COURT:  Nobody knows?  Anybody out there know?
5       MR. MULHOLLAND:  Based upon prior order --
6       THE COURT:  Danny knows.
7       MR. MULHOLLAND:  Based upon the prior order, it's
8  part of their response --
9       THE COURT:  Okay.
10      MR. SETTER:  To our motion so we (inaudible) ruled
11  upon.
12      THE COURT:  So did you file a motion to strike it or
13  something of that sort?
14      MR. SETTER:  In our reply we said, you know, based
15  upon your prior order in November, you didn't want it.
16      THE COURT:  Yes.  Okay.
17      MR. SETTER:  Now, going to the other issue about the
18  effect, the way the motion is going to be structured on the
19  Schonfeld, Sadek and Anderson, it's going to be on these
20  specific reports.  These reports have basically four varieties
21  of Schonfeld, Sadek and Anderson.  They're going to be in non-
22  malignant cases.  And, some of those reports --
23      THE COURT:  Going to be on what?
24      MR. SETTER:  The non-malignant cases in large part.
25  And, some of those reports do show up in some of the lung

Colloquy                              129

1  cancer cases.  And, if the ruling would be to strike those
2  reports by the doctors, then I don't think they can be relied
3  upon for that case by those witnesses certainly, or any other
4  witnesses.  However, I mean, if there's other evidence that
5  they have and they're reserved, I assume that the case can
6  still proceed.  I mean, I --
7       THE COURT:  Yes.
8       MR. SETTER:  -- I don't think you can just say the
9  case is disposed of.  The witness is disposed of in terms of
10  that report.
11      THE COURT:  Yes.  Yes, yes, yes, yes.  But -- but I
12  guess what I was trying to find out was whether or not -- and
13  I think I've heard whether or not the plaintiffs anticipate
14  that there will be other medical evidence that they believe
15  would -- would fill the gap, would close the hole, if there is
16  -- if there is a hole.  And, I'm hearing Bob and Mike to say
17  that in 76 cases there is other evidence, but in the remaining
18  cases there's not.
19      MR. MCCOY:  138 there's -- there's evidence.  Out of
20  the 203, there is other evidence for 138.
21      THE COURT:  138 there's other evidence?
22      MR. MCCOY:  Right.
23      THE COURT:  Okay.  So that means that leaves how
24  many that are not.
25      MR. MCCOY:  65 right we right now can't find any

Colloquy                                                    130

1  other evidence.  Medical records are incomplete on a lot of
2  people.  That's where it's at right now.
3          MR. SETTER:  But that's AO-12, not Daubert motion.
4          MR. MULHOLLAND:  But even if it Daubert, that number
5  is hotly contested.
6          THE COURT:  What -- what number?
7          MR. MULHOLLAND:  The -- well, his number of 138 of
8  203.  I don't think it's anywhere -- there may be some, but I
9  don't think it's anywhere close to that.  Then you have, if
10 they're right, then you have to look at it against the
11 backdrop of the AO-12 motions, there is no (inaudible) in
12 that.  But even so, at the end of the day we don't believe,
13 and we think we will demonstrate to the Court when it's
14 available on this issue if there's anything like 138 of 203 we
15 have treaters.
16         THE COURT:  Is that part of your motion -- going to
17 be part of your motion?  Your motion really just goes to the
18 -- the liability and so forth or --
19         MR. MULHOLLAND:  Schonfeld's diagnosis.
20         THE COURT:  Yes.
21         MR. MULHOLLAND:  Right.
22         THE COURT:  So that won't be part of your motion.
23 That's fine.
24         MR. MULHOLLAND:  That issue does not have to be
25 resolved as (inaudible).

Colloquy                                                    131

1          MR. CASCINO:  That was the issue that they brought
2  up originally.  You know, they got up and they said none of
3  these folks are gonna have treaters that agree with what Dr.
4  Schonfeld --
5          THE COURT:  They -- they did say that.  I mean, I
6  recall that.
7          MR. CASCINO:  -- nah, nah, nah, nah, nah.
8          THE COURT:  I recall.  I recall.
9          MR. LAUTH:  But in terms of the dispositive motions
10 and the potential hold on a remand, you know, that's the issue
11 that we're going to be litigating once we figure out what
12 happens with Schonfeld, Anderson and Sadek.
13         THE COURT:  No, I understand.  I understand.  So
14 you've got -- so then there will be -- there will be, you
15 know, his number.  There will be 138 other cases where they
16 will have some medical evidence, and you believe that you will
17 likely challenge the sufficiency of that medical evidence.
18 That's -- essentially that's what I hear you say, Dan; is that
19 right?  Would that -- that would be a -- that would be an
20 evenhanded way to say what it was that you articulated, right?
21         MR. MULHOLLAND:  Well, one -- you're leaving out one
22 thing.  You have to look at it -- we are in a --
23         MR. MCCOY:  Hotly contesting these or subject --
24         MR. MULHOLLAND:  You done?
25         MR. MCCOY:  Yeah.

Colloquy                                                    132

1          THE COURT:  Go ahead.
2          MR. MULHOLLAND:  What we are looking at in the
3  (inaudible).  More than likely we think it's going to be a
4  completely different (inaudible).  And, of course, we'll wait.
5  I assume Charlie is quietly waiting over there.
6          THE COURT:  Okay.  I hear you.  That's -- I
7  understand that's an implication.  I know how those -- how the
8  rulings and the motions consume us.  Okay.  I take it -- I
9  mean, I've not heard anybody raising any objection, but I
10 don't know what -- I think there was a -- there's actually a
11 filing date -- oh, it was -- wasn't there a summary judgment
12 motion filing date already this week?
13         MR. SETTER:  Yes.
14         THE COURT:  Have you -- have you heard anything with
15 respect to whether or not any of the defendants are having
16 difficulty with respect to filing these notices?
17         MR. SETTER:  Actually I tracked that.  It wasn't
18 that difficult, it didn't seem to be, the number of folks that
19 did it.  One thing I would say is, just an observation, the
20 observation was most of the cases only involve one or two
21 defendants with which a summary judgment motion was even
22 possible.  A large part of these cases are going forward with
23 summary judgment motions that are uncontested.  And, that was
24 the thing that I saw when giving notice.  There's people
25 calling me saying, "Well, it's an uncontested motion for

Colloquy                                                    133

1  summary judgment, do I need to do this?".  And, I said,
2  "There's a Court order but I (inaudible)."  I mean, if I were
3  in a position where the motion for summary judgment was
4  uncontested, I would take it and run, rather than --
5          THE COURT:  Then you need to go back and read Rule
6  56, which says that the Judge has to do an independent
7  analysis and make a determination and can't grant a motion for
8  a summary judgment simply because it's unopposed.  We have to
9  look at it and evaluate it.
10         MR. SETTER:  Well, I understand.  But in the end
11 run, is it going to end up being a case remaining or not?
12         THE COURT:  And, I hear you.
13         MR. SETTER:  If you say it's to give the notice --
14         THE COURT:  I hear you.  And, I -- I understand.
15 Obviously there's a substantial greater chance you'll get a
16 summary judgment if it's unopposed.
17         MR. SETTER:  But I -- I think from an observation
18 standpoint of case management, a docket where we've seen a lot
19 of cases we've seen where the motions for summary judgment are
20 not being opposed.  And, maybe there could be a mechanism
21 involved, I don't know.  In fact, you just cited earlier
22 but --
23         THE COURT:  Well, maybe --
24         MR. CASCINO:  To do that physically -- I mean
25 (inaudible) --

1           THE COURT:  Maybe we should -- maybe --

2           MR. CASCINO:  -- business decisions on cases.  I

3    mean, you have to understand we're -- we're on a schedule that

4    we feel how we feel.  And -- and we have to make decisions.  I

5    have lawyers that are there -- that are there till 2:00 in the

6    morning sometimes on these summary judgment motions and that.

7    And we obviously take a case and -- better case -- medical

8    case or whatever are going to go first.  Or the weaker cases

9    may go.  And, we may not get -- be able to get through all of

10   the cases that our clients would have responses to.

11          THE COURT:  So -- so are those cases where you are

12   prepared to agree to a dismissal orders?

13          MR. MCCOY:  Yes.

14          MR. CASCINO:  When they come to us and say yes,

15   yeah.

16          THE COURT:  Okay.

17          MR. CASCINO:  Yeah, I've had to budget --

18          MR. MCCOY:  We're -- we're trying to -- we're trying

19   to be continually more efficiently towards that date of --

20   where defendants were likely to proceed against their net

21   cutoff date comes very close to the close of fact discovery.

22   And, sometimes even by that -- in that short interval, we

23   can't figure out one way or the other on some of those.  But

24   we're trying to make that more accurate determination at that

25   stage.  And, then -- and then even later on they do sometimes

---

1    get that information.

2           Part of it just has to do with the logistics of

3    who's where and simply, we really have a piece of the evidence

4    that we thought we were going to get but we didn't get at the

5    end of fact discovery.  And, that's -- as soon as -- as soon

6    as we know these answers -- I'm trying to get it so people tel

7    you guys, because I -- I fully agree that we shouldn't be

8    having summary judgment re-filed if we can possibly get word

9    to them before that's due.  You know, even halfway through the

10   -- the process we say people get time on attorney fees.  So --

11          THE COURT:  Well, okay.  But I would -- but I --

12          MR. CASCINO:  We can't guarantee that either, Your

13   Honor.  I mean, we may not guarantee it.

14          THE COURT:  Can't guarantee what?

15          MR. CASCINO:  You know, after, you know, he files

16   his motions, we get on the phone and we say, okay, I'm just --

17   you know, we're not going to file responses to these, but it's

18   after the summary judgment they file their -- and, you know,

19   we -- we will try to be efficient and tell them ahead of time,

20   but we can't always do that.

21          THE COURT:  All right.  I'm going to -- okay.  I

22   understand.  I'm not -- I'm not in that fight now.  But what I

23   would like to do -- what I would like to do is to ask Mr.

24   Setter, if you've got -- if you've got this to hand, to send

25   us a note, advise us of those cases where there are motions

---

1    for summary judgment which are unopposed -- and I heard CVLO

2    say today that they would agree to the dismissal of those

3    cases.  And, predicated upon -- predicated upon that

4    representation that your identification of the documents, we

5    will -- I will pass it along to Judge Robreno, and presumably

6    he will enter a dismissal orders.

7           MR. MCCOY:  Yes.  And, on reading some of the

8    motions, sometimes we find that there is a piece of evidence

9    that they're pointing to that we don't have that we didn't

10   realize we didn't have.

11          THE COURT:  Okay.  All right.

12          MR. MCCOY:  And, that could happen.

13          THE COURT:  That's fine.  That's -- I don't need to

14   get -- I don't need to get involved in the detail of it.

15          MR. MCCOY:  Right.

16          THE COURT:  Now, the question -- the further

17   question that we have concerns this.  The -- the number of

18   cases that are where the discovery has been provided as part

19   of the SAS discovery that we've been talking about has been

20   dwindling down now.  Is it like 30 something, Mr. Setter?

21          MR. SETTER:  Yes.

22          THE COURT:  30 something?

23          MR. SETTER:  37.

24          THE COURT:  37 cases.  Okay.  So putting aside the

25   -- the issue of whether there are other -- other medical

---

1    evidence available that the plaintiffs believe they may have,

2    right, to support a causation if Sadek, Anderson, Schonfeld's

3    motion is granted, is it -- it was always my understanding

4    that the plaintiffs agreed that on these 65 cases where

5    there's no other medical cases, that the 38 who are not part

6    of the 37, the other -- the other half of them, were also

7    going to be dismissed.  Is that correct or is that incorrect?

8           MR. CASCINO:  I -- I do not believe that that's

9    correct.  I believe every case has to be done on a case-by-

10   case basis when it comes about dismissal.  However, you know,

11   if -- if it is apparent to us that it's the same piece of

12   evidence in -- in plaintiff A's case or you, know, plaintiff

13   B's case, then, you know, I'm sure we're going to make

14   accommodations and we're going to confer with the Court

15   because we can't fight every battle.

16          THE COURT:  Yeah.

17          MR. CASCINO:  So I don't -- I don't believe we've --

18   we've said that.  The SAS idea was -- was theirs, not ours.

19          THE COURT:  I -- you're right.  You're absolutely

20   right.  I understand.

21          MR. CASCINO:  But again, all of the Daubert issues

22   pretty much are going to be a case-by-case basis.

23          THE COURT:  Well, may -- I mean, at the end of the

24   day I think you're right.  But it's been suggested to me

25   there's lots of patterns.  And, that may well be demonstrated,

Colloquy 138

1  I don't know.

2        MR. CASCINO:  Your Honor, there are -- there are.

3  We can look at them.

4        THE COURT:  Let me -- let me ask you this.  Do you

5  know the -- of the 38 cases that are not ones where they're in

6  the SAS discovery, do you know what -- what scheduling orders

7  those cases are in?  Are any of them early scheduling orders?

8  Do you know that, Mr. Setter?

9        MR. SETTER:  I don't believe they are.

10        UNIDENTIFIED COUNSEL:  I think they're late.

11        THE COURT:  They're late.  They're late.  So there's

12  been really no -- very little discovery, if any, with respect

13  to that.

14        UNIDENTIFIED COUNSEL:  They're pretty much all

15  settled.

16        MS. STUDEBAKER:  They're five, six and seven --

17        THE COURT:  So it would be --

18        UNIDENTIFIED COUNSEL:  (Inaudible) seven.

19        THE COURT:  It would be -- is there anything that

20  can be done -- not to -- not to change the SAS scheduling

21  order at all, but is there anything that could be done to get

22  those cases, or at least some of those cases, for which the

23  kind of discovery that you've been obtaining from these folks

24  that concerns individual cases folded into the SAS case at

25  this point?  Understanding you're only -- you're a month away

Colloquy 139

1  from filing your motion.  You understand my question?

2        MR. SETTER:  I don't.

3        THE COURT:  You've got -- you got now apparently,

4  according to the -- the assumptions I make are this.  There

5  are 65 cases which they say are dependent upon Sadek, Anderson

6  and Schonfeld, right?  37 of those cases are cases where

7  there's -- they're part of the SAS discovery, right?  So

8  whatever you've done in terms of the discovery, you've got it

9  on those 37 cases.  You don't have it on the other 38 cases.

10        The assumption I think you had, and convinced me was

11  a viable assumption, and they may or may not agree with, is

12  that if the motion is granted, which is based in part upon the

13  discovery from those 37 cases and all the other SAS discovery

14  that's been ongoing, if that was granted, that that would mean

15  that the 38 cases, the ones that were not part of the

16  discovery, would also have to fall.

17        Mr. Cascino says -- and I understand completely why

18  -- he's not going to agree to that right now.  They got to be

19  looked at on a case-by-case basis and look at the reasons and

20  rationale for why the motion would be granted or not.  And, my

21  question is, can that issue be avoided by getting some further

22  discovery on those 38 cases to be looked at by whatever your

23  evidence is going to be with respect to Sadek, Schonfeld and

24  Anderson?

25        MR. MULHOLLAND:  Can you give us a second?

Colloquy 140

1        THE COURT:  You guys talking to each other,

2  conferring, this is very good.  Do you want to go out in the

3  hallway?

4        MR. MULHOLLAND:  That's okay.

5    (Pause)

6        MR. SETTER:  I don't think -- I think our -- our

7  position is, if we prevail on Schonfeld, Sadek and Anderson

8  based upon the reports that we are challenging as unreliable

9  on the 38, those reports go into the other cases that are

10  remaining.  So the ruling should be consistent on the

11  standpoint that we have this time -- we have, I think, about

12  four or five patterns.  And, this is the -- the same one that

13  we talked about in September in at least 10 cases, 15 cases.

14  Now, he may come back and say he's got additional evidence and

15  what have you.

16        THE COURT:  Well, that's different.

17        MR. SETTER:  But I think we say if it's been struck

18  here in terms of the short form report that Cascino Vaughan

19  prepared for Schonfeld, for Anderson, whatever our issue is,

20  and it doesn't stand in -- in the cases that we have before

21  you in September, why would it stand in the cases that remain

22  in October?  And, I think that's our -- our position is that

23  it would not.  And, then if there's a different pattern that

24  we will articulate as well.

25        For Anderson, it's the same thing.  It's the same

Colloquy 141

1  report -- the same type of report.  And, if it's found

2  unreliable in the 38 cases, it should be unreliable in the

3  cases --

4        THE COURT:  It might depend -- but it might depend

5  if some of the determinations are made on -- on a very

6  individualized basis, not -- you know, I don't -- you know

7  what they are, I don't.  But what -- you know, whatever these

8  reports are that -- some reports might be considered

9  sufficient, some might not be.

10        MR. SETTER:  Right.  Well, we're arguing that the

11  methodology employed in those three instances, those three

12  doctors in these reports is unreliable for various reasons.

13  And, that is consistent for any type of report that runs for

14  those doctors that have these matters.

15        THE COURT:  And, you have a reasonable belief that

16  -- that the other 38 cases, the same types of reports were

17  used?

18        MR. SETTER:  Yes.  Based upon the AO-12's and --

19  that's -- we already have that information.  In large part I

20  don't think we're of the same opinion.

21        THE COURT:  Okay.

22        MR. SETTER:  In fact, I'm pretty confident because

23  we (inaudible -- whispering).

24    (Pause)

25        MR. SETTER:  Your Honor, if I may?

Colloquy                                                            142

1    THE COURT:  Yes.

2    MR. SETTER:  On the -- as an example, on the motion

3  for their Cascino Vaughan's asbestos screening packets,  we

4  noticed that in approximately 400 to 500 cases in which we had

5  the Anderson and Schonfeld -- what we call short-form reports.

6  And, so that's -- that's virtually the whole docket, except

7  for about 50 to 60 cases that do not involve Schonfeld and

8  Anderson doctors.  So I think the point is, if we prevail on

9  our motion, those cases are probably going to be at issue in

10  terms of at least Schonfeld and Anderson, because they have

11  the same report.

12    THE COURT:  When you say "those cases," you mean THE

13  COURT: 38?

14    MR. SETTER:  No, the 400.  If we win the 38, I think

15  the 400 are at jeopardy.

16    THE COURT:  Well, that's -- well, how do you --

17    MR. SETTER:  Well, not -- the case isn't in

18  jeopardy, but at least Schonfeld and Anderson's report in that

19  case.

20    THE COURT:  Oh, you mean where the -- where the --

21  if -- well, yes.  I mean, I think if the information that

22  treaters or other rely upon comes from Sadek, Anderson and

23  Schonfeld, and that's been, you know, tainted or whatever,

24  yes, that will have to be looked at on a --

25    MR. SETTER:  All right.


Colloquy                                                            143

1    THE COURT:  Right.  I understand that.

2    MR. SETTER:  Right.  But I'm just trying to

3  illustrate that there's 400 cases where we have basically the

4  same type of report for Schonfeld and Anderson.  And -- and

5  it's -- we are challenging the method on that and that's why

6  they're (inaudible) screening packet, so on and so forth, but

7  I don't want to get into that just yet.

8    THE COURT:  Look, I'm not -- right, I'm not here to

9  argue this now.  What I am here to do is to try to make sure

10  that the -- that there is a maximization that is reasonable

11  and sensible and fair to the plaintiffs as to how that ruling

12  would be utilized.  And, I am not going to -- I'm not going to

13  -- you know, I'm not going to enter any kind of an order about

14  that in advance now.  We don't -- I don't know.

15    I mean, I think Mr. Cascino is right, I don't know.

16  It's going to have to be -- we have to wait and see what

17  happens.  And, what I'm trying to do is to see if there's a

18  way I can do anything now, so that I can eliminate the wait-

19  and-see-what-happens by having you incorporate into what

20  you're doing the information you have on these other -- at

21  least the other 38, you know, that they're saying might be

22  involved.  And, maybe if you've got the documentation from the

23  AO-12's in those cases, if that's what you have, they get

24  folded in, that would be -- that would be helpful.  But -- but

25  maybe not.  I don't know enough about how your -- what your


Colloquy                                                            144

1  approach is and how you're going to go about doing it to know.

2    I'm sure I'll -- hopefully it will all be clarified

3  for me in September when we get into the hearing.  But that's

4  my -- that's my problem.  What I don't want is to go through

5  all this, and we spend all this time and effort doing all

6  this, and it has limited impact.

7    MR. SETTER:  I don't think it will.  I mean --

8    THE COURT:  Well, I know you've told me that, but

9  I'm trying to get myself -- I'm trying to get more comfortable

10  with the fact.

11    MR. SETTER:  And, that's why I was trying to suggest

12  to you that this motion for these 400 cases we asked for

13  request for admissions about CVLO preparing the reports, the

14  reports, when they send me the names are virtually identical.

15    THE COURT:  You guys never give up.  That's great.

16  Go ahead.

17    MR. SETTER:  They're virtually identical.  I mean,

18  they do have specific information for that plaintiff, but the

19  report format in terms of what's collected and the methodology

20  is identical.

21    THE COURT:  All right.  Okay.  Okay.

22    UNIDENTIFIED COUNSEL:  I won't respond.

23    THE COURT:  You disappoint me if you're not

24  responding.  All right.  I think that's probably all we need

25  to cover.  Is it, Joel?


Colloquy                                                            145

1    (Pause)

2    THE COURT:  Well, Joel is reminding me that we

3  didn't talk about the -- frankly, I think I've got enough.  I

4  mean, there's a -- there's a motion to quash the second

5  subpoena issued to Dr. Henry.  I've got that in front of me.

6  I think I understand what the issues are on that.  We just got

7  to get it written up.  And, the production of the CVLO's

8  asbestos screening packet.  This is a relatively newly filed

9  motion.  I'm out of time.  I do want to ask you, however,

10  about the GE motion with respect to the transcripts.  And, I

11  -- I know that Mr. Lauth, I think -- I guess it was you, Mr.

12  Lauth -- filed a motion for reconsideration?

13    MR. LAUTH:  No, that's Westinghouse's guys.

14    UNIDENTIFIED COUNSEL:  Yeah.

15    MR. LAUTH:  The painter case with respect to

16  production of transcripts.

17    THE COURT:  Westinghouse's motion.  But that's you.

18    MR. LAUTH:  No, that's me.  You've got the wrong

19  guy.  He's not Westinghouse, he's GE.

20    THE COURT:  I'm -- I'm going to do that, I'm sure,

21  for the next year.  So that was your motion for

22  reconsideration?

23    MR. LAUTH:  Yes, Your Honor.

24    THE COURT:  Can you tell me, have you -- have you

25  guys -- do you have anything from Cascino Vaughan?  Because

Colloquy                                                                146

1  you remember that order talked about --

2       MR. LAUTH:  It required --

3       THE COURT:  That order indicated that you were to

4  get information from Cascino Vaughan.

5       MR. LAUTH:  I think the deadline on that's today.  I

6  don't know that I've seen it, but I've been with you in the

7  interim.

8       MR. CASCINO:  My understanding is that the court

9  reporter is supposed to have to our office by 2:00 in the

10 afternoon.  And, my secretary, I told her that she has to stay

11 there until she gets to me tonight.

12      THE COURT:  Okay.

13      MR. CASCINO:  And, she said she will get it done by

14 5:00.

15      THE COURT:  And, what about -- what about your own

16 -- your own document?  One of the things that was raised was

17 that you guys also have or should have these transcripts.

18      MR. CASCINO:  It's all being -- it's all being done

19 exactly word-for-word of what Your Honor wanted in the order.

20      THE COURT:  Good.  Okay.

21      MR. CASCINO:  Your Honor, with regard to the --

22      THE COURT:  But all I -- all I do want to say about

23 that, before you leave that topic, is that I'm -- I'm going to

24 look at your motions as whether or not it meets the

25 qualifications for reconsideration or not.  I don't know.  I


Colloquy                                                                147

1  haven't looked at it rigorously.  But I want to look at that

2  in connection with what happens here.

3       MR. CASCINO:  Okay.

4       THE COURT:  In my judgment, that impacts burden.  I

5  did that a lot, as you know, on the burden analysis.  And,

6  that impacts burden.  And, I take your points, which I think

7  you've already made.  But nonetheless, I take your points.

8  But I -- it's going to be dependant upon that.  So your motion

9  is filed.  And, you might want to look at that motion and

10 whether you want to adjust anything in your -- not change your

11 position.  I don't care, you do whatever you feel you need to

12 do for your client.  But -- but it -- it may very well be

13 impacted.  And, I would expect you to address the question of

14 whether it is impacted by what you get from Pullman or what

15 you get from Cascino Vaughan.

16      MR. LAUTH:  Okay.

17      THE COURT:  Now, maybe I'm -- I think you probably

18 think it doesn't make any difference because if -- if you're

19 looking for a needle in a haystack, it doesn't make a

20 difference if you're looking for 20 needles or 2 needles, you

21 still got to go through the whole haystack.  But that's your

22 basic position.  You know, that's -- that's not going to

23 change.  But --

24      MR. LAUTH:  Certainly, if what they tell me is they

25 don't need anything as they can get it all from a more


Colloquy                                                                148

1  convenient and available source, I am glad for that to be the

2  answer.  And, I'll be glad to take a look at --

3       THE COURT:  Yes, but that -- but that -- that

4  further reduces the burden of my ruling.

5       MR. LAUTH:  Well, then there won't be anything left.

6  And, there will be no burden.

7       THE COURT:  Okay.

8       MR. CASCINO:  Your Honor, on the issue of the

9  defendant's motion to quash Dr. Henry, may I have leave to

10 file a three-page surrebuttal?  There are some facts that I

11 was going to argue today that the Court should have -- should

12 be aware of before he rules on -- on that motion.  So if I

13 could have leave to file just a three-page surreply, I'd

14 appreciate it.

15      THE COURT:  How about if I give you five minutes

16 right now?

17      MR. CASCINO:  That's fine, too.

18      THE COURT:  Go ahead.  I didn't -- I didn't say too.

19 I meant -- I meant, you know, one or the other.  Either/or.

20      MR. CASCINO:  Oh, I --

21      THE COURT:  Well, let's take it one step at a time.

22 Just tell me what your -- tell me what it was that you want to

23 add, and we'll see whether or not I think you --

24      MR. CASCINO:  All right.

25      THE COURT:  -- ought to give it to you.


Colloquy                                                                149

1       UNIDENTIFIED COUNSEL:  Tough decision.

2       MR. CASCINO:  All documents concerning Dr. Henry in

3  Chemrisk.  We did not receive any of the documents concerning

4  the McElroy (phonetic) case, which was a case that he did the

5  same type of study with Chemrisk a year earlier.  We did not

6  get those documents, and that's why we requested them.

7       THE COURT:  Were they -- was that requested back in

8  the summer when I entered -- I think I entered an order in

9  August of some date, if I recall correctly.

10      MR. CASCINO:  It was requested in our -- you know,

11 by our subpoena.  And, I don't believe -- I don't know -- I

12 don't remember the order to be honest.

13      THE COURT:  Well, that's pretty important, because

14 basically what they're saying is that -- I've already ruled on

15 a lot of this, and I -- I know I've -- I'm not sure about that

16 particular point, but I know I -- I did -- I covered a lot of

17 these -- well -- issues previously.

18      MR. CASCINO:  And -- and we're at a different stage

19 of the litigation at this point.  I mean, I find out about

20 this and, you know, we would like -- I don't believe in

21 discovery, to be honest about it.

22      Secondly, Your Honor, with regard to all B read

23 control films done by Dr. R.T., L.S. and J.P., they're

24 responses that Dr. Henry does not have those.  But that's not,

25 in fact, what he testified.  He said, I don't actually -- "I

Colloquy                                                                 150

```
1    don't know actually where they went.  I don't remember.  All I
2    have is just a composition of testimony.  I don't have all of
3    the individual records."  And, it is our position, Your
4    Honor --
5            THE COURT:  What were you reading from?
6            MR. CASCINO:  Dr. Henry's deposition.
7            THE COURT:  Okay.
8            MR. CASCINO:  He does not say definitively he does
9    not have those documents.  He does not say he does not have
10   access to those documents either because they were part of
11   this R. Grace study (phonetic) that -- that he did conduct.
12   And, what I need, Judge, is simply one thing.  There's three B
13   readers that have their initials.  And, they read control
14   films.  I want to know how they read those control films.
15   Because in the case of Dr. Schonfeld, when -- when we look at
16   the control films, we see that those doctors that were hired
17   by the defense underread the control films.  And, we'd like to
18   have the same opportunity to look at that with regard to Dr.
19   Anderson.
20           And, Dr. Anderson has requested that -- that we look
21   at that because that will tell us if these people underread or
22   they don't underread.  And -- and so it's important that we
23   get the control films from these three doctors that are known
24   by their initials, and that Dr. Henry does have access to
25   those documents, I do believe.  He's the author of the study.
```

Colloquy                                                                 151

```
1    He does not say definitively that he does not have these
2    documents.  And -- and that's the testimony that I read to
3    you.  So it's important that we get those documents.
4            The third point I want to make with regard to this
5    is that the other requests that we make go to the issue of
6    money.  How much money that Dr. Henry made from the defendants
7    in this litigation.  Dr. Henry only remembers one company that
8    may have hired him out of 114 law firms that are before this
9    Court.  The law firms have those records, and the attorneys
10   have information, especially in asbestos litigation.  And,
11   they're obligated to provide that information back, because
12   Dr. Henry has been doing this litigation, doing B reads for
13   years and years and years.  And, for him to claim, well, I
14   only remember McGuire Woods asking, you know, me to do
15   business.  Well, we want to know how much money he's made.
16           THE COURT:  Well, but -- but you're taking it
17   another step by -- by trying to get it from the law firms.
18   What I -- what I was operating under, frankly, was -- I think
19   you saw, is a 26(b)(2).  I think it's (b)(2) -- which is that
20   part of Rule 26 that talks about what needs to be provided
21   with an expert report, what you're entitled to.  And, I
22   understand the position about he's not really an expert in the
23   same sense, or someone took that position.  But I'm treating
24   him essentially that way, which -- which, to me, appropriately
25   guides the discovery.  And, that was the principle basis upon
```

Colloquy                                                                 152

```
1    which I -- I rendered my decision before.  I'm not likely to
2    -- to change it, but I appreciate your argument.
3            And, now you want to give me a little -- if you want
4    to give me a paper in a couple of days, I don't have any
5    objection.  Do you want to respond at all, Mr. Setter?
6            MR. SETTER:  Just -- just briefly, Your Honor.  Two
7    things that I think jump out on this.  One, your August 29th
8    wasn't an order.  We had a conference.  The transcript is in
9    the paper.  And, here's what you ruled.  You basically said he
10   can get documents -- Mr. Cascino can get documents from Mr. --
11   Dr. Henry concerning the Schonfeld study in this matter and
12   the Grace matter as well.
13           Anything else he can make inquiry about, but the
14   documents are limited to that, as well as any documentation
15   about dealing with any defendant in this litigation, including
16   Forman Perry, okay, the law firm.  He produced on September --
17   whatever it was, his deposition -- everything that he had
18   concerning the Schonfeld study, everything that he had with
19   respect to the Grace study.  We got into the whole issue with
20   Grace, if you recall, from the standpoint that Mr. Cascino had
21   to go back to Grace and give get B reads (phonetic), which he
22   did, concerning the Henry issue in Grace.
23           I don't know why he didn't get the control films.
24   But he obviously has access to do it.  Dr. Henry testified
25   that he doesn't have it.  If I need an affidavit saying that
```

Colloquy                                                                 153

```
1    he doesn't have it, he doesn't have -- he doesn't have those
2    Grace documents anymore.  They were turned over to Grace,
3    they're part of the Grace bankruptcy.  And, there would be big
4    issues about the confidentiality as we went through this
5    before.
6            THE COURT:  Yes, I recall this.
7            MR. SETTER:  And, then last, but not least, on the
8    money issue, he said, look, I've worked for Forman Perry and
9    I've worked for McGuire Woods.  And, I think McGuire Woods is
10   in the context of some Worker Comp. cases or whatever he said.
11   And, he says, "I don't have anything, but I'll tell you how
12   much Grace paid me.  I'll tell you how much Forman Perry has
13   paid me."  And, I don't know if he -- if he went in to how
14   much McGuire Woods paid him, but I thought he said, I've only
15   been involved in three or four Worker Comp. cases doing some B
16   reads.  That's it.  My point --
17           THE COURT:  Did he provide information about how
18   much revenue he's earned as a result of doing Forman Perry
19   business?
20           MR. SETTER:  Yes.  Absolutely.  He produced the
21   invoices.
22           THE COURT:  All right.
23           MR. CASCINO:  Your Honor, he only produced them with
24   regard to the Dr. Schonfeld study and with regard to the
25   doctor in the R. Grace study.  He did not provide any other
```

Colloquy                                          154

1  financial stuff with regard to Forman Perry.

2       MR. SETTER:  But I think he told you about that.  Go

3  read the transcript.

4       MR. CASCINO:  I -- I am familiar with the

5  transcript.  And, so, again --

6       THE COURT:  All right.  Well, have to go back and

7  take a look at the -- look at the transcript ourselves and --

8  and make a determination.  But if you want to, you know, right

9  this up and clarify it for me and for folks here, that would

10 be good.  And, if you could get it done by next Wednesday,

11 that would be very helpful.

12      MR. MULHOLLAND:  Your Honor, may I -- on the

13 asbestos screening packet motion, we got their response during

14 dinner last night.  Can we -- can we have till maybe Thursday

15 to submit a short reply?

16      THE COURT:  Sure.  You got that, Lauren?  You give

17 it to him -- give him -- okay.  Anybody in the general gallery

18 have any questions -- further questions or comments or

19 whatever?  Okay.  I have -- as far as I'm concerned, we're

20 adjourned.  Does anybody have anything else?

21      UNIDENTIFIED COUNSEL:  No.

22      THE COURT:  Okay.  Thank you very much.

23      ALL COUNSEL:  Thank you, Your Honor.

24    (Proceedings concluded at 1:18 p.m.)

25

155

1              **C E R T I F I C A T I O N**

2

3            We, Josette Jones, Tara Martin, and Brenda

4  Boulden, court approved transcribers, certify that the

5  foregoing is a correct transcript from the official electronic

6  sound recording of the proceedings in the above-entitled

7  matter.

8

9

10 _____    _____

11 JOSETTE JONES                DATE

12

13 _____    _____

14 TARA MARTIN                  DATE

15

16 _____    _____

17 BRENDA BOULDEN               DATE

18 DIANA DOMAN TRANSCRIBING